# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2008AP1523 |
| COMPLETE TITLE: | |

Rock-Koshkonong Lake District, Rock River-Koshkonong Association, Inc. and Lake Koshkonong Recreational Association, Inc.,

        Petitioners-Appellants-Petitioners,

    v.

State of Wisconsin Department of Natural Resources,

        Respondent-Respondent,

Lake Koshkonong Wetland Association, Inc. and Thiebeau Hunting Club,

        Intervenors-Respondents.

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 336 Wis. 2d 677, 803 N.W.2d 853
(Ct. App. 2011 - Published)
PDC No: 2011 WI App 115

| | |
|---|---|
| OPINION FILED: | July 16, 2013 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 5, 2012 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Rock |
| JUDGE: | Daniel T. Dillon |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | CROOKS, J., ABRAHAMSON, C.J., BRADLEY, J., dissent. (Opinion filed.) |
| NOT PARTICIPATING: | |

ATTORNEYS:

    For the petitioners-appellants-petitioners, there were briefs by *William P. O'Connor*, *Mary Beth Peranteau* and *Wheeler, Van Sickle & Anderson, S.C.*, Madison, and *Arthur J. Harrington* and *Douglas M. Poland* and *Godfrey & Kahn, S.C.*, Milwaukee, and oral argument by *William P. O'Connor* and *Arthur J. Harrington*.

    For the respondent-respondent, the cause was argued by *Cynthia R. Hirsch*, assistant attorney general, and the brief was filed by *Joanne F. Kloppenburg*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*, attorney general.

For the intervenors-respondents, there was a brief filed by *Charles V. Sweeney* and *Mitchell R. Olson,* and *Axley Brynelson, LLP*, Madison, and oral argument by *Charles V. Sweeney*.

An amicus curiae brief was filed by *Miriam Ostrov* and *Midwest Environmental Advocates, Inc.,* Madison, on behalf of the River Alliance of Wisconsin.

An amicus curiae brief was filed by *Thomas D. Larson*, Madison, on behalf of the Wisconsin Realtors Association.

An amicus curiae brief was filed by *Elizabeth Wheeler*, Madison, on behalf of Clean Wisconsin, Wisconsin Wetlands Association and Wisconsin Lakes.

An amicus curiae brief was filed by *Duffy Dillon*, Janesville, on behalf of the Manitowish Chain Defense Fund, LLC.

An amicus curiae brief was filed by *Andrew C. Cook* and *Emily Stever Kelchen,* and *Great Lakes Legal Foundation, Inc.*, Madison, on behalf of Wisconsin Manufacturers & Commerce and Midwest Food Processors Association.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2008AP1523
(L.C. No. 2006CV1846)

STATE OF WISCONSIN      :      IN SUPREME COURT

Rock-Koshkonong Lake District, Rock River-
Koshkonong Association, Inc. and Lake
Koshkonong Recreational Association, Inc.,

       Petitioners-Appellants-Petitioners,

     v.

State of Wisconsin Department of Natural
Resources,

       Respondent-Respondent,

Lake Koshkonong Wetland Association, Inc. and
Thiebeau Hunting Club,

       Intervenors-Respondents.

**FILED**

**JUL 16, 2013**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed and cause remanded.*

¶1 DAVID T. PROSSER, J. This case, involving a dispute about the water levels on Lake Koshkonong, presents fundamental questions about the authority of the Wisconsin Department of Natural Resources (the DNR), and the criteria it uses in

regulating the level of water in navigable waters that are affected by dams.

¶2   Wisconsin Stat. § 31.02(1)[1] authorizes the DNR to regulate the level and flow of water in the navigable waters of Wisconsin.   The DNR may order benchmarks designating "the maximum level of water that may be impounded and the lowest level of water that may be maintained by any dam."  Wis. Stat. § 31.02(1).   The statute provides that the DNR may regulate water levels "in the interest of public rights in navigable waters or to promote safety and protect life, health and property."  Id.

¶3   The dispute here results from a 2003 petition (the Petition) by the Rock-Koshkonong Lake District, Rock River-Koshkonong Association, Inc., and Lake Koshkonong Recreational[2] Association, Inc. (collectively, the District)[3] to raise the DNR-

---

[1] All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

[2] The complaint initiating judicial review of the DNR decision by the Rock County Circuit Court named "Lake Koshkonong Recreational Association, Inc." as one of the petitioners. However, the proper name of the entity is "Lake Koshkonong Recreation Association, Inc." as indicated by Wisconsin Department of Financial Institution corporate records. Therefore, all further references to the association will use its proper name.

[3] The Rock-Koshkonong Lake District filed the Petition in 2003 to raise the water levels on the lake.  After the DNR rejected the Petition, Rock River-Koshkonong Association, Inc. and Lake Koshkonong Recreation Association, Inc. jointly petitioned with the Rock-Koshkonong Lake District for a contested case hearing.  For the sake of simplicity, we will refer to all three entities as the District throughout this opinion, unless otherwise noted.

designated water levels of Lake Koshkonong.  The DNR rejected the Petition, and its denial was affirmed by an administrative law judge (ALJ) in a contested case hearing by the Rock County Circuit Court, Daniel T. Dillon, Judge, and by the court of appeals.  See Rock-Koshkonong Lake Dist. v. DNR, 2011 WI App 115, 336 Wis. 2d 677, 803 N.W.2d 853.  The ALJ's decision was adopted as the decision of the DNR.

¶4    We are presented with four issues.

¶5    First, what level of deference, if any, should be accorded to the DNR's conclusions of law under the circumstances of this case?

¶6    Second, did the DNR exceed its authority in making a water level determination under Wis. Stat. § 31.02(1) "in the interest of public rights in navigable waters," by considering the impact of water levels on private wetlands that are adjacent to Lake Koshkonong and located above the ordinary high water mark?

¶7    Third, did the DNR exceed its authority in making a water level determination under Wis. Stat. § 31.02(1) "in the interest of public rights in navigable waters" by considering wetland water quality standards in Wis. Admin. Code § NR 103?

¶8    Fourth, did the DNR err in making a water level determination under Wis. Stat. § 31.02(1) by excluding evidence and refusing to consider the impacts of water levels on residential property values, business income, and public revenue?

¶9    We conclude the following:

3

¶10 The DNR's conclusions of law are subject to de novo review because the DNR's water level order under Wis. Stat. § 31.02(1) is heavily influenced by the DNR's interpretation of the scope of its own powers, its interpretation of the Wisconsin Constitution, its disputed interpretation of the statute it utilized, and its reliance upon statutes and rules outside of Wis. Stat. ch. 31.

¶11 The DNR properly considered the impact of the Petition's proposed water levels on public and private wetlands in and adjacent to Lake Koshkonong. However, the DNR inappropriately relied on the public trust doctrine for its authority to protect non-navigable land and non-navigable water above the ordinary high water mark. The DNR has broad statutory authority grounded in the state's police power to protect non-navigable wetlands and other non-navigable water resources. Thus, the DNR may consider the water level impact on all adjacent property under Wis. Stat. § 31.02(1).

¶12 The DNR was entitled to consider the water quality standards in Wis. Admin. Code § NR 103, promulgated under Wis. Stat. ch. 281, when making a Wis. Stat.§ 31.02(1) water level determination. By statute, the DNR is responsible for writing and enforcing wetland water quality standards in this state. Accordingly, it would be unreasonable for the DNR to ignore statutes and its own administrative rules when making a water level determination affecting wetlands. Therefore, the DNR may consider § NR 103 water quality standards when making a water level determination under Wis. Stat. § 31.02(1) that affects

4

wetlands and may apply these standards when appropriate after weighing the factors in the statute.   However, Wis. Stat. § 281.92 suggests that the DNR is not required to apply ch. 281 standards in making a determination under Wis. Stat. § 31.02 because ch. 31 is excepted from the provisions of ch. 281.

¶13  The DNR erroneously excluded most testimony on the economic impact of lower water levels in Lake Koshkonong on the residents, businesses, and tax bases adjacent to and near Lake Koshkonong.   This evidence was relevant to the DNR's decision-making under Wis. Stat. § 31.02(1).   Although the DNR is granted substantial discretion in its decision-making under the statute, it must consider all probative evidence when its decision is likely to favor some interests but adversely affect others.   In this case, the DNR's exclusion of most economic evidence was inconsistent with its acceptance of competing economic evidence that helped sustain its water level decision.

¶14  We remand this case to the circuit court for further proceedings consistent with this opinion.

I. FACTS AND PROCEDURAL HISTORY

¶15  We begin the statement of facts and procedural history with an examination of the Rock River, Lake Koshkonong, and the Indianford Dam.   Next, we explain the purpose of ch. 31 of the Wisconsin Statutes, the history of water levels on Lake Koshkonong, and the Petition.   We then summarize the contested case hearing and the resulting decision, In the Matter of the Review of the Water Level Decision for Lake Koshkonong and the Indianford Dam on the Rock River in Rock County, Wisconsin, Case

No. 3-SC-2003-28-3100LR, (DNR, Dec. 1, 2006) [hereinafter the Decision], which was adopted by the DNR.  Finally, we lay out the procedural history of the District's appeal.

### A. The Rock River

¶16 The Rock River originates in Dodge County near Theresa, just south of the Fond du Lac County line.  It flows in a southerly, then southwesterly direction, passing through such Wisconsin communities as Watertown, Fort Atkinson, Janesville, and Beloit before entering Illinois.  The Rock River empties into the Mississippi River near Rock Island, Illinois.  Its total length is nearly 300 miles.

¶17  The mouth of the Rock River flows into Lake Koshkonong about four miles downstream from the City of Fort Atkinson in Jefferson County.  The outlet of the lake, which funnels water back into the narrow channel of the Rock River, is situated about six miles upstream from the Indianford Dam in Rock County.

### B. Lake Koshkonong

¶18 Lake Koshkonong, the sixth largest inland lake in Wisconsin, is a natural widening of the Rock River[4] located in Jefferson, Rock, and Dane Counties.  While Lake Koshkonong has a wide surface area (approximately 10,460 acres), it is quite shallow.  At the current targeted water level ordered by the DNR in 1991, Lake Koshkonong's average depth is only five feet and

---

[4] Lake Koshkonong and the Rock River are navigable waters under Wisconsin law.  See Wis. Stat. § 30.10(1) and (2) (declarations of navigability for lakes and streams).

its maximum depth is only seven feet.[5] The topography of the shoreline is gently sloped in such a way that water levels of one to two feet can extend quite far into the lake.

¶19 Lake Koshkonong has 27 miles of shoreline. Ten miles of shoreline have been developed for residential and some commercial use. Approximately 2,788 residential parcels are located within a half-mile of the lake, with more than 600 riparian parcels adjacent to the lake.

¶20 Lake Koshkonong contains 12.4 miles of wetland shoreline. Among the largest wetlands in and adjacent to the lake are Koshkonong Creek (278 acres of shallow marsh and floodplain forest); Krumps Creek (335 acres of shallow marsh); Mud Lake (921 acres of shallow marsh); Otter Creek (334 acres of shallow marsh and floodplain forest); Thiebeau Marsh (494 acres of shallow marsh, shrub, and meadow); and the state-owned and DNR-managed Koshkonong Wildlife Area (715 acres of shallow marsh, shrub, and meadow known as an area of "special natural resource interest" under Wis. Admin. Code § NR 103.04). These areas and all of Lake Koshkonong are replete with diverse species of wildlife and vegetation. The ALJ found that the

---

[5] Around the time of statehood, Lake Koshkonong had a very different appearance than it does today. Visiting the area in July 1850, Dr. I.A. Lapham wrote, "The water is from 4 to 12 feet deep. At the time of our visit, . . . wild rice was growing abundantly over almost its whole surface, giving it more the appearance of a meadow than a lake." W.H. (Bill) Rodgers, Early History of Lake Koshkonong 1 (Mar. 21, 1961) (unpublished manuscript) (on file with Hoard Historical Museum, Fort Atkinson, Wis.).

7

wetland shoreline has eroded since 1940. "The reduced frequency of low water conditions during the summer and the increase in the average summer water levels . . . account for the loss of wetlands over the past 70 years."

### C. The Indianford Dam

¶21 The Indianford Dam affects water levels on the Rock River and Lake Koshkonong. In 1843 the Wisconsin territorial legislature authorized Clouden and Luke Stoughton to build the original dam; however, the Stoughtons did not construct the dam until after March 1851, when the state legislature again authorized construction. Around 1917 the dam was reconstructed, which raised water levels on Lake Koshkonong. The Rock-Koshkonong Lake District, which was created in 1999, took over ownership and operation of the dam from Rock County in 2004.[6]

¶22 The dam fell into general disrepair in the 1960s until it was rehabilitated in 2002. Because of this disrepair, the dam's operation was compromised and it failed to regulate water levels on Lake Koshkonong——to conform with the target levels set by the DNR——for much of the time between the late 1960s until about 2002. As a result, water levels on Lake Koshkonong since 1965 have almost always exceeded the current target level of 776.20 feet above mean sea level (msl),[7] as the following chart from the Decision illustrates:

---

[6] Rock County took over ownership of the dam in December 1965 from the Wisconsin Power & Light Co.

[7] Msl is a unit of measurement for water levels.

| Date | Water Level (ft.) | Date | Water Level (ft.) | Date | Water Level (ft.) |
|------|-------------------|------|-------------------|------|-------------------|
| 1965 | 776.60 | 1978 | 777.64 | 1991 | 776.40 |
| 1966 | 776.25 | 1979 | 777.27 | 1992 | 776.49 |
| 1967 | 776.28 | 1980 | 777.23 | 1993 | 779.16 |
| 1968 | 777.01 | 1981 | 776.51 | 1994 | 776.51 |
| 1969 | 776.90 | 1982 | 776.88 | 1995 | 777.02 |
| 1970 | 776.36 | 1983 | 776.63 | 1996 | 777.72 |
| 1971 | 776.31 | 1984 | 776.63 | 1997 | 776.98 |
| 1972 | 777.23 | 1985 | 776.51 | 1998 | 776.79 |
| 1973 | 777.86 | 1986 | 778.98 | 1999 | 777.44 |
| 1974 | 777.61 | 1987 | 776.51 | 2000 | 777.59 |
| 1975 | 777.15 | 1988 | 776.10 | 2001 | 777.18 |
| 1976 | 776.49 | 1989 | 776.25 | 2002 | 776.68 |
| 1977 | 776.11 | 1990 | 776.75 |  |  |

¶23  The "statistically significant upward trend in average water levels" on Lake Koshkonong from 1932 to 2003 was partly attributable to the "diminished operating range of the wicket gates" on the dam before its 2002 repairs, as well as debris on the trash racks of the dam that impeded flowage.

D. Wis. Stat. Chapter 31 and the District's Petition

¶24  Chapter 31 of the Wisconsin Statutes grants the DNR authority to regulate dams and bridges affecting navigable waters in the state.  The DNR may regulate and control the level and flow of water in all navigable waters "in the interest of

public rights in navigable waters or to promote safety and protect life, health and property." Wis. Stat. § 31.02(1). Section 31.02(2) states that the "construction, operation, [and] maintenance . . . of dams in navigable waters shall be subject to the supervision of the [DNR] and to the orders and regulations of the [DNR]." Thus, a dam operator must petition the DNR[8] for an order if it wishes to raise or lower the water levels of a navigable body of water in a manner inconsistent with a previously existing order.

¶25 The Wisconsin Railroad Commission (the Railroad Commission) issued the first water level order for the Indianford Dam in 1919. The next order was not issued until 1982, when the DNR, on its own motion, issued another order reestablishing water levels pursuant to Wis. Stat. § 31.02(1). The DNR determined that the existing order was inadequate to control the water levels of Lake Koshkonong.

¶26 However, the 1982 order was appealed by three individuals, two lake-based recreation clubs, a property owners association, and Rock County. The Jefferson County Circuit Court's decision affirming the 1982 order was appealed to the court of appeals, which remanded to the DNR to hold a hearing before issuing any water level order. A compromise between the

---

[8] The legislature originally delegated authority to issue water level orders to the Railroad Commission. § 3, ch. 380, Laws of 1915 (creating Wis. Stat. ch. 69m. § 1596——2.1. (1915)). The Public Service Commission and then the DNR became the successor agencies responsible for issuing water level orders under Wis. Stat. ch. 31.

DNR and the parties resulted in a 1991 water level order.  The 1991 order left the 1982 order largely intact, raising slightly the minimum lake elevation in the winter and eliminating a flashboard[9] requirement.[10]

¶27  In 2002, after the rehabilitation of the Indianford Dam restored full operating capability to the dam's gates, the water levels on Lake Koshkonong began to reflect more closely the levels set by the 1991 order.  As a result, water levels on the lake dropped below recorded levels since the 1930s.  On April 21, 2003, the District[11] petitioned the DNR, pursuant to Wis. Stat. § 31.02(1), to amend the 1991 order.  The District contended that the 1991 order was "not consistent with the public interest" because lower water levels on Lake Koshkonong led to severe restrictions on recreational boating and in many cases "piers must be extended far from shore to reach navigable water depths."  In addition, the District expressed concern for the effect that the winter drawdown in the 1991 order had on shore erosion, plants, and animal species.

---

[9] A flashboard is a "board or structure of boards extending above a dam to increase its capacity."  The American Heritage Dictionary of the English Language 691 (3d ed. 1992).

[10] The DNR amended the 1991 order in 2004 to reflect the change in ownership of the Indianford Dam from Rock County to the Rock-Koshkonong Lake District.  The 2004 amendment made no substantive changes to the 1991 water order.

[11] Rock-Koshkonong Lake District was established by Rock County in 1999, pursuant to Wis. Stat. §§ 33.24 and 33.37(1), "to undertake a program of . . . protection and rehabilitation for Lake Koshkonong."  More than 4,000 parcels of land in Rock, Jefferson, and Dane Counties make up the Rock-Koshkonong Lake District.

¶28  The following chart compares the 1991 water level order and the proposed water levels in the Petition:[12]

| MSL Levels (at lake gage) | 1991 Order | Petition | Change |
|---|---|---|---|
| May through October | | | |
| Target | 776.20' | 776.8' | +0.6' (7.2 in.) |
| Maximum (all gates open) | 776.33' | 777.0' | +0.67' (8 in.) |
| Minimum | 775.73' | 776.4' | +0.67' (8 in.) |
| November through April | | | |
| Maximum (all gates open) | 775.77' | 777.0' | +1.23' (14.8 in.) |
| Minimum | 775.00' | 776.4' | +1.4' (16.8 in.) |

¶29  In 2003 and 2004 the DNR conducted an environmental assessment (EA) of the Petition's proposed water level order to determine whether an environmental impact statement (EIS) would be needed.  The DNR completed a draft EA in December 2004, after which a public hearing was held in January 2005 for comment on the findings.  The DNR certified the EA as complete in March 2005 and determined that an EIS would not be necessary.

¶30  On April 15, 2005, the DNR issued a proposed order denying the Petition, keeping the summer maximum water level at

---

[12] A  chart  with  identical  information  appears  in  the Decision and in the court of appeals opinion, Rock-Koshkonong Lake District v. DNR, 2011 WI App 115, ¶5, 336 Wis. 2d 677, 803 N.W.2d 853.

776.33 msl but raising the winter drawdown minimum to 775.50 msl instead of 775.00 msl.

¶31 Shortly thereafter, the District filed a joint petition for a contested case hearing of the DNR's denial of the Petition. The DNR granted the request and then filed a hearing request with the Department of Administration, Division of Hearings and Appeals (DHA).[13]

### E. The Contested Case and Decision

¶32 The ten-day contested case hearing on the DNR's proposed order commenced on March 29-30, 2006, in Jefferson, and continued in Madison at the DHA offices on April 3-5 and 10-14. During the Jefferson hearing, members of the public provided sworn testimony and statements on how the Petition would affect their community and personal interests, while representatives of the parties to the contested case provided expert testimony.

¶33 As part of its pre-filed direct expert testimony, the DNR sought to show the adverse impact that the District's proposed water level increase would have on adjacent wetlands

---

[13] Rock River-Koshkonong Association, Inc. (RRKA) and Lake Koshkonong Recreation Association, Inc. (LKRA) joined in the petition for a contested case hearing. RRKA is comprised of more than 300 members, including riparian business owners on Lake Koshkonong and the Rock River. LKRA is an association of approximately 38 individual and business members who rely on Lake Koshkonong and the Rock River for business, recreation, and tourism.

The Intervenors in this case——Lake Koshkonong Wetland Association, Inc. and the Thiebeau Hunting Club (the Intervenors)——also were certified as parties to the contested case proceeding.

and water quality in Lake Koshkonong and the Rock River. One DNR expert testified in detail how raising the water levels of Lake Koshkonong would "result in secondary and cumulative adverse impacts to wetlands." These adverse impacts included continued erosion of wetlands; loss of wildlife and fish habitat; loss of vegetation and floodplain forest; and eventually reduced recreational opportunities for hunters, fishermen, trappers, and birdwatchers. Furthermore, while Lake Koshkonong has lost a great deal of wetlands over the years and will continue to lose wetlands, raising water levels in the lake as the District proposes would exacerbate the losses. Other DNR experts echoed these conclusions.[14] Overall, the DNR experts testified to the importance of making sure the proposed DNR water level order satisfied the wetland water quality standards in Wis. Admin. Code § NR 103.

¶34 Expert testimony on behalf of the Intervenors concurred with the DNR testimony on adverse impacts to wetlands and wetland water quality if the District's proposed water level order were implemented.

¶35 The Jefferson County Farm Drainage Board also presented testimony on the adverse impact of higher water levels on Lake Koshkonong: any increase in water levels would lead to backups in the drainage district upstream from the lake, causing lands to stay flooded longer and increase crop losses. Dennis

---

[14] The District and the DNR also devoted a significant amount of testimony to disputing the validity of water level modeling by the District.

Kutz, an agricultural landowner in the drainage district, indicated in pre-filed direct testimony that his yield on corn could "be reduced downward from 180 to 100 bushels per acre at a cost of $200-$300 per acre. Other farmers would likely have similar losses."

¶36 The District presented evidence at the contested case hearing, through expert testimony, on modeling data to predict water levels under the Petition, along with the probable effect of the District's water level order on navigation, water quality, and fish and wildlife habitat.

¶37 The District also presented evidence of economic impacts resulting from, and anticipating, lower water levels on the lake. Land use planner and real estate analyst John Stockham testified that a reduction in historical water levels on Lake Koshkonong would have adverse effects on property values and commercial activity related to the lake. Essentially, Stockham testified that lower water levels than those observed before the Indianford Dam was fully operational in 2002 would result in decreased waterfront usage; loss of the ability to use existing piers for boating, swimming, and other water activities; loss of access to shoreline for boats; and reduced areas of navigability. Reduced usable water access would, over time, have an adverse impact on property values around Lake Koshkonong; this reduced value would be reflected in the slower rate of increase for Lake Koshkonong property values compared to "lakefront property values in general in south central

Wisconsin."[15]  Stockham testified that lake-based businesses also would suffer losses from reduced water levels.  The most affected businesses would be lakefront marinas, taverns, and restaurants that depend on boaters and tourists for a large portion of their revenue.  Even businesses in nearby communities who cater to lake-related activity would suffer from water levels on Lake Koshkonong reduced from their historical levels.  In addition, reduced water access and property values would result in a loss of tax base for local taxing jurisdictions.

¶38 Dr. Russell Kashian, an economics professor at the University of Wisconsin-Whitewater, also provided testimony on behalf of the District on the economic impact of lowering a lake's water level.  Using various economic methodologies, Kashian concluded that a reduction in historical water levels on Lake Koshkonong would result in a negative economic impact in two areas: property values and a reduced rate of appreciation of those values, and economic activity in communities surrounding the lake.

¶39 In regard to lake property values, Kashian posited that lower water levels mean a greater distance between the lake home and the shore, and that the increased distance would result

---

[15] Testimony on behalf of the Intervenors by Linn Duesterbeck, a real estate appraiser, contradicted John Stockham's assertions on the reduced rate of property value increases around Lake Koshkonong since 2002.  Duesterbeck's property value testimony was later excluded by the ALJ, along with the testimony of John Stockham and Dr. Russell Kashian, as outside the scope of a Wis. Stat. § 31.02(1) water level determination.

in lower property value; Kashian also testified that property value is adversely affected by a decrease in shoreline length. The reduction in lake water levels, both real and perceived by potential property buyers, would lead to a softening of demand for lake property and a consequent reduction in prices, along with a slower appreciation in property value over time. Kashian cited numerous studies on the economic impact of reduced lake water levels to support his conclusions. Kashian concluded that the DNR's proposed water level order would endanger Lake Koshkonong property values.

¶40  Finally, Kashian testified on the adverse effects that reduced lake water levels would have on economic activity in the local community.  Assuming a three-foot reduction in Lake Koshkonong water levels, Kashian testified that "real estate and service sector businesses would witness a decline of $9 million in gross sales that support an estimated 150 total jobs." Moreover, "local retail businesses would witness a decline of $5.25 million in gross retail sales that support an estimated 200 total jobs."

¶41  Public testimony on the commercial effects of adhering to the DNR's 1991 water level order echoed the District's expert testimony.  A campground and marina owner testified to the "huge" economic impact that lake-based tourism has on area business and property values, as well as the negative impact that lower water levels would have.  Several other business owners on Lake Koshkonong testified that current low water levels required the installation of piers of up to 300 feet in

17

length in order to accommodate customers who access their businesses by boat.

F. The Decision's Findings of Facts and Analysis

¶42  On December 1, 2006, the ALJ, William S. Coleman, Jr., issued a meticulous, comprehensive Decision affirming the DNR's proposed order rejecting the Petition.  The Decision contained 120 findings of fact,[16] which, after laying out the history and statistics on Lake Koshkonong and the Indianford Dam, may be briefly summarized as follows:

1.  Historical Water Levels on Lake Koshkonong——Water levels rose from 1932 to 2003, and this was due in part to the defective Indianford Dam.  Consequently, summer water levels on the lake were above the DNR's target levels every year but two from 1965 to 2003.

2.  Wetlands——The high historical water levels on the lake have eroded shoreline wetlands around the lake.  The reduced frequency of low water conditions in the lake have contributed to this loss of wetland.  Other than the state-owned Koshkonong Wildlife Area, the findings of fact do not explicitly identify how much of the wetlands are publicly owned, or what portion of the wetlands are above the ordinary high water mark.

3.  Water Quality——Higher water levels have caused a "degraded turbid algae-dominant water condition" in Lake Koshkonong.  An increase in water levels would likely further

---

[16] The District does not dispute any of the 120 findings of fact.

18

degrade water quality in the lake.[17]  Higher water levels would lead to additional loss of wetlands, which would affect the lake system's ability to slow flood and storm waters, and "filter nutrients, sediments and other pollutants," such that more pollutants would be carried downstream.

4.   The Ordinary High Water Mark[18] (OHWM)——The OHWM on Lake Koshkonong increased from 1979 to 2001, due in part to the diminished capacity of the Indianford Dam to properly regulate water levels.   The DNR considered 778.11 msl to be "a representative OHWM" for purposes of evaluating the Petition. The higher water levels under the Petition could result in a higher OHWM.

5.   Erosion Protection from Riprap Structures[19]——Higher water levels on the lake would likely overwhelm existing riprap structures that protect wetland shoreline.   These structures would more quickly degrade and result in expensive fortification of the structures.   In any event, the riparian wetlands would

---

[17] According to the findings of fact, Lake Koshkonong is likely to remain in a degraded condition regardless of whether the DNR's proposed order or the Petition is adopted.

[18] "By ordinary high-water mark is meant the point on the bank or shore up to which the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction of terrestrial vegetation, or other easily recognized characteristic." Diana Shooting Club v. Husting, 156 Wis. 261, 272, 145 N.W. 816 (1914).

[19] Riprap is a "loose assemblage of broken stones erected in water or on soft ground as a foundation." The American Heritage Dictionary of the English Language 1556 (3d ed. 1992).  Riprap is used to protect shorelines from water or ice erosion.

19

not be protected from increased wave action and would continue to erode.

6.    Wildlife——Past and continued higher water levels would adversely impact habitats for herptiles and bird species. Continued loss of wetland would result in loss of wildlife and fish habitat in and around Lake Koshkonong.

7.    Winter Drawdown——The findings of fact contain numerous pros and cons of maintaining the winter drawdown of the lake levels (under the DNR's proposed order) and eliminating the winter drawdown under the Petition.    The findings generally point to adverse impacts on wetlands, wildlife, water quality, and riprap structures if the winter drawdown were eliminated.

8.    Agricultural Drainage——Higher water levels will cause backups in a drainage district upstream from Lake Koshkonong. Slower drainage would cause farmland to be flooded longer, resulting in delays in planting and smaller crop yields.

9.    Public Access——The shallow, sloping waters of Lake Koshkonong make it difficult for most recreational boats to utilize public boat ramps on the lake under either the DNR's proposed water level order or the District's proposed higher levels.    However, there are a number of boat access points along the Rock River near the lake that have sufficient depth for recreational boats.

10. Riparian Access——Most riparian property owners favor raising the lake's water levels so that they may shorten their piers.    Boat lifts and shore stations also could be maintained

closer to shore if the District's proposed higher water levels were implemented.

11. Natural Scenic Beauty——Fuller "pool levels" are more aesthetically pleasing to riparian property owners than exposed lake beds. However, some riparians value the beauty of the wetlands that would be lost with higher water levels.

12. Navigability——Raising water levels on the lake would increase the surface area of the lake by up to 63 acres and mitigate existing navigational obstacles in the lake.[20]

13. The Wis. Stat. § 31.02(1) Standard——The findings of fact concluded with, "The net negative effects of the proposed higher water levels far outweigh the enhancements to navigation and access." Thus,

> [a]llowing increased water levels as proposed by the District would be inconsistent with the interest of public rights in Lake Koshkonong and the Rock River, and would not serve to protect life, health or property. Public safety may be marginally promoted with increased water levels, but the water levels specified in the DNR's 2005 order do not pose undue risks to public safety.

¶43 The Decision noted that the DNR objected during the contested case hearing to admitting evidence related to the

---

[20] No one appears to have challenged any of the ALJ's findings of fact. We note, however, that the ALJ found that Lake Koshkonong has a surface area of approximately 10,460 acres, after the water levels in Lake Koshkonong were lowered to conform to the DNR's 1991 order. The figure 10,460 acres is identical to the figure used by the DNR in a 1971 Wisconsin Conservation Bulletin. Shoreland is Vulnerable, Wis. Conservation Bulletin, (DNR, Madison, Wis.), July-August 1971, at 22.

effect of water levels on real estate values, business income, and public revenues. The Decision sustained the DNR's objections, citing Wisconsin's Environmental Decade, Inc. v. DNR, 115 Wis. 2d 381, 404, 340 N.W.2d 722 (1983), and asserting that "[s]econdary or indirect economic impacts of a water level determination do not bear on the statutory standard set forth in section 31.02(1)." Therefore, the ALJ struck Stockham and Kashian's economic testimony on behalf of the District, along with all related exhibits, as secondary economic impacts outside the scope of the statute.[21] The Decision did consider riparian access, which the ALJ said "comprehends at least one component of these asserted secondary impacts." The Decision acknowledged that riparian owners' "diminished utility and enjoyment of their property [resulting from lower water levels] . . . doubtless reduces the value of that property to them."

¶44 The Decision noted that the DNR was required to balance and accommodate conflicting interests when making a water level determination and that the DNR had done that here. Furthermore, the DNR "evaluated the proposed water level increase against the appropriate regulatory standards, including chapter NR 103, Wis. Admin. Code."

---

[21] In a contested case hearing, a hearing examiner "shall not be bound by common law or statutory rules of evidence. The agency or hearing examiner shall admit all testimony having reasonable probative value, but shall exclude immaterial, irrelevant or unduly repetitious testimony or evidence that is inadmissible under s. 901.05." Wis. Stat. § 227.45(1).

¶45 Thus, the Decision closes with a conclusion of law that "the DNR's decision [to reject the District's proposed higher water levels] . . . is necessary to protect the public rights in navigable waters and reasonably balances and accommodates public and private rights, the promotion of safety, and the protection of life, health, and property."

¶46 The DNR adopted the Decision as its own, by operation of Wis. Stat. § 227.46(3)(a) (2003-04) and Wis. Admin. Code § NR 2.155(1) (Sept. 2004).

### G. The District's Appeal

¶47 Following the Decision, the District petitioned for review by the Rock County Circuit Court under Wis. Stat. § 227.53.  The District contended that the Decision erroneously interpreted "public rights in navigable waters" and the phrase "protect . . . property."  The District argued that the DNR improperly expanded its consideration of "public rights in navigable waters" to include private wetlands and that the DNR improperly considered wetland water quality standards in Wis. Admin. Code § NR 103, as promulgated under Wis. Stat. ch. 281. The District further argued that it was improper for the DNR to categorically exclude all evidence of economic effects on property in its Decision because, by doing so, it misinterpreted the mandate in Wis. Stat. § 31.02(1) to "protect . . . property."  However, the circuit court affirmed the Decision, concluding that the DNR's interpretation of the statutes was reasonable and that the Decision was supported by substantial evidence.

23

¶48 The District appealed to the court of appeals, which certified the District's appeal to this court on the issue of "ambiguity" in Wis. Stat. § 31.02(1) related to the phrase "protect . . . property." This court denied the certification request.

¶49 The court of appeals then issued an opinion affirming the DNR's Decision, this time holding that Wis. Stat. § 31.02(1), including its "protect . . . property" language, was "unambiguous." Rock-Koshkonong Lake Dist., 336 Wis. 2d 677, ¶47. First, the court of appeals reasoned that when the legislature wants the DNR to consider property values and economic effects in its decision-making, "it does so in clear, unambiguous language." Id., ¶42 (citing statutes). Second, the court of appeals concluded that if the DNR were required to consider economic factors when making a determination under Wis. Stat. § 31.02(1) to "protect . . . property," such an interpretation "would have no logical stopping point." Id., ¶43. Finally, the court of appeals looked to this court's interpretation of similar statutory language in City of New Lisbon v. Harebo, 224 Wis. 66, 271 N.W. 659 (1937), for the proposition that protection of property is "limited to protection of real property from hydrologic events like flooding." Id., ¶45.

¶50 The court of appeals decision also held that the DNR's consideration of the impact of water levels on adjacent wetlands and § NR 103 water quality standards was reasonable. The court of appeals determined these considerations to be consistent with

24

"the very resources [the DNR] has been assigned to protect" and that the DNR is not restricted to considerations below the OHWM. Id., ¶¶52–53.  The court of appeals also concluded that the DNR has a responsibility to protect water quality standards in this state, and to disregard that duty when making a water level determination under Wis. Stat. § 31.02(1) would be absurd.  Id., ¶56.

¶51  The District petitioned this court for review, which we granted on February 23, 2012.

## II. DISCUSSION

### A. Standard of Review

¶52  This court normally provides a separate section on "standard of review" before proceeding to its legal analysis. In this case, the standard of review is itself an issue, namely, whether the court should give deference to the DNR's conclusions of law.

¶53  When a party appeals to the court of appeals or seeks review in this court "from a circuit court order reviewing an agency decision," the appellate court reviews the decision of the agency, not the decision of the circuit court. Lake Beulah Mgmt. Dist. v. DNR, 2011 WI 54, ¶25, 335 Wis. 2d 47, 799 N.W.2d 73 (quoting Hilton ex rel. Pages Homeowners' Ass'n v. DNR, 2006 WI 84, ¶15, 293 Wis. 2d 1, 717 N.W.2d 166).

¶54  In Hilton, the court examined the standard of review that should be applied to an ALJ decision that had been expressly adopted by the DNR pursuant to Wis. Stat. § 227.46(3)(a).  The court concluded that "because the DNR has

25

expressly adopted the ALJ decision, the ALJ decision should be afforded the same deference afforded the agency." Hilton, 293 Wis. 2d 1, ¶14.

¶55 In this case, the Decision contains 120 specific findings of fact. The District does not challenge any of these findings. If it did challenge any of the findings of fact, the court would apply a substantial evidence standard. See id., ¶16 (citing Borsellino v. DNR, 2000 WI App 27, ¶7, 232 Wis. 2d 430, 606 N.W.2d 255).

¶56 In this case, the Decision contains four conclusions of law grounded in the facts. However, the District asserts that the DNR exceeded the scope of its authority under Wis. Stat. § 31.02(1) by focusing on the protection of public and private wetlands above the OHWM; misinterpreted the mandate to "protect . . . property" in § 31.02(1); and excluded relevant evidence that should have been considered under the statute. The District also asserts that the DNR improperly considered the standards in Wis. Admin. Code § NR 103 in making its water level determination under § 31.02(1).

¶57 These assertions involve issues of agency procedure and agency interpretation of law that are treated separately as questions of law.

¶58 Agency determinations involving questions of law, including interpretation and application of statutes, are reviewable by this court under Wis. Stat. § 227.57(5). ABKA Ltd. P'ship v. DNR, 2002 WI 106, ¶30, 255 Wis. 2d 486, 648 N.W.2d 854. Section 227.57(5) provides that "[t]he court shall

set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law."

¶59 While statutory interpretation is normally a question of law determined independently by a court, a court may give an agency's interpretation of a statute great weight deference,[22] or due weight deference,[23] or no deference.[24]  Racine Harley-Davidson, Inc. v. Wis. Div. of Hearings & Appeals, 2006 WI 86, ¶¶11, 19, 292 Wis. 2d 549, 717 N.W.2d 184.  See generally

---

[22] Great weight deference is appropriately applied to an agency's legal conclusions where:

> (1) the agency was charged by the legislature with the duty of administering the statute; (2) the interpretation of the statute is one of long-standing; (3) the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) the agency's interpretation will provide uniformity and consistency in the application of the statute.

Hilton ex rel. Pages Homeowners' Ass'n v. DNR, 2006 WI 84, ¶15, 293 Wis. 2d 1, 717 N.W.2d 166 (quoting Clean Wis., Inc. v. Pub. Serv. Comm'n, 2005 WI 93, ¶39, 282 Wis. 2d 250, 700 N.W.2d 768) (brackets omitted).

[23] Due weight deference is applied when "the agency has some experience in an area, but has not developed the expertise which necessarily places it in a better position to make judgments regarding the interpretation of the statute than a court." Clean Wis., 282 Wis. 2d 250, ¶42 (quoting Hutson v. Wis. Pers. Comm'n, 2003 WI 97, ¶33, 263 Wis. 2d 612, 665 N.W.2d 212) (internal quotation marks omitted).

[24] As a general rule, a reviewing court accords an agency no deference when the agency has decided an issue of first impression, when an agency lacks experience or expertise in deciding a legal issue, or when an agency has taken inconsistent positions on a legal issue. UFE, Inc. v. LIRC, 201 Wis. 2d 274, 285, 548 N.W.2d 57 (1996).  But there are additional reasons for not according deference, as noted infra in this opinion.

Salvatore Massa, The Standards of Review for Agency Interpretations of Statutes in Wisconsin, 83 Marq. L. Rev. 597 (2000). Deference, however, "does not mean that the court accepts the agency interpretation without a critical eye. The court itself must always interpret the statute to determine the reasonableness of the agency interpretation. Only reasonable agency interpretations are given any deference." Racine Harley-Davidson, 292 Wis. 2d 549, ¶15.

¶60 Here the DNR is charged by the legislature with the duty of administering Wis. Stat. § 31.02(1), and it brought to its enforcement of the statute a great deal of expertise and specialized knowledge. However, the DNR's interpretation of the statute is not long-standing with respect to some of the issues before this court, and, as will be seen, its interpretation is not likely to be uniform and consistent in its application because of the diverse factual circumstances that will be presented. Thus, the DNR's conclusions of law in statutory interpretation are not entitled to great weight deference.

¶61 Another factor works against deference. "The nature and scope of an agency's powers are issues of statutory interpretation." Wis. Citizens Concerned for Cranes & Doves v. DNR, 2004 WI 40, ¶6, 270 Wis. 2d 318, 677 N.W.2d 612 (citing GTE N., Inc. v. Pub. Serv. Comm'n, 176 Wis. 2d 559, 564, 500 N.W.2d 284 (1993)). Courts are not bound by an agency's decision concerning the scope of its own power. Wis. Citizens Concerned, 270 Wis. 2d 318, ¶11; Wis.'s Envtl. Decade, Inc. v. Pub. Serv. Comm'n, 81 Wis. 2d 344, 351, 260 N.W.2d 712 (1978);

28

Big Foot Country Club v. DOR, 70 Wis. 2d 871, 875, 235 N.W.2d 696 (1975); Nekoosa-Edwards Paper Co. v. Pub. Serv. Comm'n, 8 Wis. 2d 582, 592, 99 N.W.2d 821 (1959) (citing cases).

¶62 In this case, the DNR is at odds with the District over the scope of the agency's power. As will be seen, the DNR has given new interpretations to both the Wisconsin Constitution (Article IX, Section 1) and Wisconsin Statutes, disregarded some past decisions of this court, and acted inconsistently with some of its own prior positions. Under these circumstances, we afford no deference to the DNR's interpretation and application of Wis. Stat. § 31.02(1) and consider the legal issues presented de novo.[25]

¶63 The DNR concluded that the economic impacts of lower water levels on residential and business property are not relevant in making a water level determination, despite language in Wis. Stat. § 31.02(1) authorizing the DNR to

---

[25] Wisconsin Stat. § 227.57(8) provides in part:

> The court shall reverse or remand the case to the agency if it finds that the agency's exercise of discretion is outside the range of discretion delegated to the agency by law; is inconsistent with an agency rule, an officially stated agency policy or a prior agency practice, if deviation therefrom is not explained to the satisfaction of the court by the agency; or is otherwise in violation of a constitutional or statutory provision . . . .

This statute implicates the scope of the DNR's authority as well as the agency's past decisions and policy. It provides additional authority for not affording deference to the DNR in this matter.

29

"protect . . . property."  As will be discussed later in this opinion, categorically excluding these economic factors from consideration in a water level determination under § 31.02(1) is not reasonable.  Cf. Racine Harley-Davidson, 292 Wis. 2d 549, ¶15 (stating that only reasonable agency interpretations receive deference).

¶64  Thus, we afford no deference to the DNR's interpretation and application of Wis. Stat. § 31.02(1) in this case.

### B. The DNR'S Consideration of Impacts on Wetlands Adjacent to Navigable Waters

¶65  The District contends that the DNR, in making a water level determination under Wis. Stat. § 31.02(1) "in the interest of public rights in navigable waters," exceeded its authority when it considered impacts on private wetlands adjacent to Lake Koshkonong that are above the OHWM.  The District is also concerned about the application of the public trust doctrine to any wetlands that are not navigable in fact unless those wetlands are below the OHWM.  The District asserts that the DNR's position significantly expands the scope of the DNR's public trust jurisdiction.

¶66  The Decision explains the decision-maker's understanding of the applicable law.  In his Discussion section, the ALJ wrote:

> "Public rights" in the state's public trust navigable waters extend beyond navigation relating to commerce, and include the following: "sailing, rowing, canoeing, bathing, fishing, hunting, skating, and

30

other public purposes," <u>Nekoosa Edwards Paper Co. v. Railroad Commission</u>, 201 Wis. 40, 228 N.W. 144, 147 (1929); right to clean, unpolluted water, <u>Reuter v. DNR</u>, 43 Wis. 2d 272, 168 N.W.2d 860 (1969); consideration of wetlands and near shore lands, <u>Just v. Marinette County</u>, 56 Wis. 2d 7, 201 N.W.2d 761 (1972); wildlife habitat, and preservation of scenic beauty, <u>Village of Menomonee Falls v. DNR</u>, 140 Wis. 2d 579, 412 N.W.2d 505 (Ct. App. 1987).

¶67 This paragraph cites the public trust doctrine as authority for the DNR to regulate wetlands and near shorelands, wildlife habitat, and scenic beauty.

¶68 The DNR's brief to this court confirms this position:

1. "Wetlands in and adjacent to navigable waters have long been included in public rights to navigable waters because of their special relationship to navigable waters."

2. "[P]ublic rights in wetlands 'adjacent to or near navigable waters' are public rights in, not beyond, navigable waters."

3. "If petitioners were correct that the public trust does not extend to privately owned non-navigable lands . . . then the shoreland zoning law fails, too."

4. "[P]ublic rights embrace all wetlands in or adjacent to navigable waters, privately or publicly owned, above or below the OHWM."

¶69 In evaluating the District's concerns about these claims, it is necessary to examine the constitutional and statutory directives associated with public rights in navigable waters and the wetlands adjacent to them, along with this court's interpretation of these directives.

31

¶70  Wisconsin has a long tradition of "protect[ing] our valuable water resources."  Lake Beulah, 335 Wis. 2d 47, ¶31.  The state relies on several sources of authority to achieve this objective.

¶71  Article IX, Section 1 of the Wisconsin Constitution commands that the state hold navigable waters in trust for the public:

> The state shall have concurrent jurisdiction on all rivers and lakes bordering on this state so far as such rivers or lakes shall form a common boundary to the state and any other state or territory now or hereafter to be formed, and bounded by the same; and the river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost or duty therefor.

Wis. Const. art. IX, § 1.

¶72  This court has long held that the public trust in navigable waters "should be interpreted in the broad and beneficent spirit that gave rise to it in order that the people may fully enjoy the intended benefits."  Diana Shooting Club v. Husting, 156 Wis. 261, 271, 145 N.W. 816 (1914); Lake Beulah,

335 Wis. 2d 47, ¶31.[26]  Broadly interpreting the public trust has resulted in recognition of more than just commercial navigability rights.    Protection now extends to "purely recreational purposes such as boating, swimming, fishing, hunting, . . . and . . . preserv[ing] scenic beauty."    R.W. Docks & Slips v. State, 2001 WI 73, ¶19, 244 Wis. 2d 497, 628 N.W.2d 781 (citing State v. Bleck, 114 Wis. 2d 454, 457, 338 N.W.2d 492 (1983)).

¶73  Because the public trust doctrine is rooted in Article IX, Section 1, however, it is important to understand its history and its core principles so that it is properly interpreted.   There is no better place to start than Justice George Currie's scholarly analysis of the doctrine in Muench v. Public Service Commission, 261 Wis. 492, 53 N.W.2d 514 (1952):

> After the Revolutionary War, the original thirteen states were impoverished and were confronted with the problem of paying the debts created by the war.   States without western lands demanded that Virginia, and other states claiming such lands to the west, should cede the same to the Confederation to be sold to pay such debts.   In 1783 the Virginia legislature authorized the ceding of the Northwest

---

[26] The legislature is "bound by its duty to protect the navigable waters of the state for the citizens' benefit" and "to evaluate," before acting to affect the water, "all potential benefits that can be derived from water."   Gabe Johnson-Karp, That the Waters Shall be Forever Free: Navigating Wisconsin's Obligations Under the Public Trust Doctrine and the Great Lakes Compact, 94 Marq. L. Rev. 415, 422 & n.37 (2010).   For a general discussion of the evolution of the public trust doctrine in Wisconsin, see Melissa Kwaterski Scanlan, The Evolution of the Public Trust Doctrine and the Degradation of Trust Resources: Courts, Trustees and Political Power in Wisconsin, 27 Ecology L.Q. 135 (2000).

Territory to the Confederation, and the actual deed of conveyance was executed March 1, 1784.  This cession was made upon two conditions: (1) The new states to be admitted as members of the Federal Union were to have the same rights to sovereignty as the original states; and (2) the navigable waters flowing into the Mississippi and the St. Lawrence rivers, and the carrying places between them, were to be forever free public highways.  These conditions were incorporated into the Northwest Ordinance of 1787, which set up the machinery for the government of the Northwest Territory.

Sec. 1, art. IX of the Wisconsin constitution, adopted by the territorial convention on February 17, 1848, and approved by the act of congress admitting Wisconsin into the Union, incorporated verbatim the wording of the Northwest Ordinance with respect to navigable waters . . . .

Muench, 261 Wis. at 499.

¶74 Justice Currie then explained that a number of questions rise naturally from the article: (1) What are "navigable waters"?  (2) Who owns the "land" under "navigable waters"?  (3) What are the public rights in navigable streams apart from navigation for commercial purposes?  (4) What are the geographic limits of the public trust in navigable waters?  Id. at 500-08.

¶75 The answers to these questions, in Muench and other cases, are interrelated, and they help to explain the District's concern with the DNR's position.

1. Questions Raised by the Public Trust Doctrine

¶76 The public trust doctrine is premised upon the existence of "navigable waters."  The test of navigability discussed in Olson v. Merrill, 42 Wis. 203, 212 (1877), whether a stream has the capacity to float logs to market (at least part

34

of the year), has long since been replaced by the standard of "navigable in fact for any purpose."[27]  Muench, 261 Wis. at 505–06.

> [S]ince 1911 it is no longer necessary in determining navigability of streams to establish a past history of floating of logs, or other use of commercial transportation, because any stream is "navigable in fact" which is capable of floating any boat, skiff, or canoe, of the shallowest draft used for recreational purposes.

Id. at 506; see also Bleck, 114 Wis. 2d at 459; DeGayner & Co. v. DNR, 70 Wis. 2d 936, 946–47, 236 N.W.2d 217 (1975).

¶77 The DNR's position seeks to extend its public trust jurisdiction[28] beyond navigable waters to non-navigable waters and land.  Wetlands are often not "navigable in fact."  Non-navigable land is by definition not navigable and may not be marshy or "wet."  Eliminating the element of "navigability" from the public trust doctrine would remove one of the prerequisites for the DNR's constitutional basis for regulating and

---

[27] Justice Currie cites Olson v. Merrill, 42 Wis. 203, 212 (1877), as one of the early cases that established the "saw-log" test.  Muench v. Pub. Serv. Comm'n, 261 Wis. 492, 500, 53 N.W.2d 514 (1952).  The "saw-log" test first appears in Whisler v. Wilkinson, 22 Wis. 546 (*572), 549 (*576) (1868).

[28] In furtherance of the state's public trust obligations, "the legislature has delegated substantial authority over water management matters to the DNR."  Wis.'s Envtl. Decade, Inc. v. DNR, 85 Wis. 2d 518, 527, 271 N.W.2d 69 (1978); see also ABKA Ltd. P'ship v. DNR, 2002 WI 106, ¶12, 255 Wis. 2d 486, 648 N.W.2d 854 (noting that the "legislature has delegated to the DNR broad authority to regulate under the public trust doctrine").

controlling water and land.[29]  Applying the public trust doctrine to non-navigable land above the OHWM would eliminate the rationale for the doctrine.  The ramifications for private property owners could be very significant.

¶78 The public trust doctrine vests the ownership of land under lakes——i.e., lake beds——in the state.  By contrast, the public trust doctrine in Wisconsin gives riparian owners along navigable streams a qualified title in the stream beds to the center of the stream, while the state holds the navigable waters in trust for the public.  In reality, the state effectively

---

[29] This court has rejected theories that attempt to extend the public trust doctrine beyond its historical limitations. For instance, in DeGayner & Co. v. DNR, 70 Wis. 2d 936, 236 N.W.2d 217 (1975), the court reviewed the issue of whether Five Mile Creek, a tributary of the Namekagon River in Bayfield County, was navigable in fact, thereby requiring a permit to construct a dam to create an artificial lake. Id. at 938–39. While the court determined that the creek was navigable in fact, it rejected a theory offered by an amicus that a stream should be considered "as a navigable water [irrespective of any other finding], because it is a tributary of a natural and valuable navigable resource, the Namekagon river." Id. at 948. The DeGayner court continued:

> There is evidence to show that the flow of spring water from Five Mile Creek is important in maintaining the fish life and the water quality of the Namekagon . . . . [Nonetheless, the] test, proposed by the amicus . . . , has not been recognized by the statutes or by the common law; and, as the trial judge pointed out, that test, in its simplistic form, can be carried to ridiculous extremes, for it would mean that all tributaries, since they eventually run into some navigable body of water, must be held navigable.

Id.

controls the land under navigable streams and rivers without actually owning it.

¶79  In Muench, the court observed:

The United States [S]upreme [C]ourt in Barney v. Keokuk (1876), 94 U.S. 324, 24 L. Ed. 224, declared that the individual states have the right to determine for themselves the ownership of land under navigable waters. At an early date in its history the Wisconsin court put itself on record as favoring the trust doctrine, that the state holds the beds underlying navigable waters in trust for all of its citizens, subject only to the qualification that a riparian owner on the bank of a navigable stream has a qualified title in the stream bed to the center thereof. See the discussion of this subject in McLennan v. Prentice (1893), 85 Wis. 427, 443-445, 55 N.W. 764.

Muench, 261 Wis. at 501-02.

¶80  Muench quotes two sentences from Illinois Steel Co. v. Bilot:

The United States never had title, in the Northwest Territory out of which this state was carved, to the beds of lakes, ponds, and navigable rivers, except in trust for public purposes; and its trust in that regard was transferred to the state, and must there continue forever, so far as necessary to the enjoyment thereof by the people of this commonwealth. Whatever concession the state may make without violating the essentials of the trust, it has been held, can properly be made to riparian proprietors.

Id. at 502 (quoting Ill. Steel Co. v. Bilot, 109 Wis. 418, 426, 84 N.W. 855 (1901)).

¶81  The Bilot case went on to say:

Under that [concession to riparian proprietors], by long-established judicial policy, which has become a rule of property, a qualified title to submerged lands of rivers navigable in fact has been conceded to the

37

owners of the shores.  Otherwise the title to lands under all public waters is in the state, and it is powerless to change it. . . .  Hence we must presume from the evidence that the title to the land in dispute is where the evidence tends to show it is.  We should say in passing that the term "qualified title" as above used refers to that interest in the beds of navigable streams which has passed to private ownership according to the uniform holdings of this court,——a full title, subject to the public rights which were incident to the lands forming such beds at the time of the creation of the trust above mentioned. No private ownership has been conceded which displaces or materially affects such public rights.  As to them the state has not abdicated and cannot abdicate its trust.

Bilot, 109 Wis. at 426 (emphasis added).

¶82  The state's ownership of lake beds was confirmed in State v. McDonald Lumber Co., 18 Wis. 2d 173, 176, 118 N.W.2d 152 (1962), Wisconsin's Environmental Decade, Inc. v. DNR, 85 Wis. 2d 518, 526, 271 N.W.2d 69 (1978), and State v. Trudeau, 139 Wis. 2d 91, 101-02, 408 N.W.2d 337 (1987).  The rule is different with respect to the beds under streams[30] in part because streams can change course, streams can become unnavigable over time, and navigable streams can be very narrow and shallow, so that state ownership of stream beds could be problematic and impractical.

¶83  Writing in Diana Shooting Club, Justice Vinje observed that "[i]t would no doubt have been more logical to hold, as English courts do, that private ownership ends where

---

[30] "In some of the states embraced within the Northwest territory the title to the bed of navigable streams remained in the state.  In Wisconsin it is held to be in the riparian owners." Diana Shooting Club, 156 Wis. at 268.

navigability begins."   Diana Shooting Club, 156 Wis. at 269.
But he added that,

> there is nothing inconsistent in the doctrine of
> private ownership of beds of navigable streams subject
> to all the burdens of navigation and the incidents
> thereof.  As long as the state secures to the people
> all the rights they would be entitled to if [the
> state] owned the beds of navigable rivers, it fulfills
> the trust imposed upon it by the organic law which
> declares that all navigable waters shall be forever
> free.

Id.

¶84 Contemplating the question of ownership is important
because the public trust doctrine implicates state ownership or
virtual state ownership——by virtue of its trust responsibility——
of land under navigable waters.   If the public trust were
extended to cover wetlands that are not navigable, it would
create significant questions about ownership of and trespass on
private land, and it would be difficult to cabin expansion of
the state's new constitutionally based jurisdiction over private
land.[31]

¶85 In its discussion of public trust, the DNR points
specifically to M&I Marshall & Ilsley Bank v. Town of Somers,
141 Wis. 2d 271, 288, 414 N.W.2d 824 (1987), where this court

---

[31] Virtual state ownership of navigable waters and the land
beneath navigable waters——under the public trust doctrine——does
not implicate questions of eminent domain.   The State has no
need to take what it already "owns."   However, geographic
expansion of the public trust beyond the boundaries of the OHWM
of navigable waters would inevitably raise a slew of new
questions about just compensation.   This has never been a part
of public trust jurisprudence.

stated that a parcel of private wetland located "partly within and partly outside a shoreland area should be treated as if the entire wetland was located within a shoreland area."  To apply this reasoning to the scope of the public trust doctrine would not represent a logical application of the doctrine.

¶86  There is no constitutional foundation for public trust jurisdiction over land, including non-navigable wetlands, that is not below the OHWM of a navigable lake or stream.  Applying the state's police power to land above or beyond the OHWM of navigable waters——to protect the public interest in navigable waters——is different from asserting public trust jurisdiction over non-navigable land and water.

¶87  The public trust doctrine entails public rights in navigable waters, including non-commercial "sailing, rowing, canoeing, bathing, fishing, hunting, skating, and other public purposes."  Nekoosa-Edwards Paper Co., 201 Wis. at 47.  The state's public trust duty "requires the state not only to promote navigation but also to protect and preserve its waters for fishing, hunting, recreation, and scenic beauty."  Wis.'s Envtl. Decade, 85 Wis. 2d at 526 (emphasis added).  The court cited Muench to support scenic beauty.

¶88  Applying the "scenic beauty" referenced in Muench and Wisconsin's Environmental Decade to this case takes the concept beyond its original purpose to protect and preserve navigable "waters."  In Muench, the court noted the passage of Chapter 523, Laws of 1929, which amended Wis. Stat. § 31.06(3) "so as to provide that the enjoyment of scenic beauty is a public right to

40

be considered by the Public Service Commission in making findings as to whether a permit for a proposed dam shall be issued." Muench, 261 Wis. at 508.[32] See also DeGayner, 70 Wis. 2d at 949.

¶89 Considering scenic beauty in relation to the construction of a dam in navigable waters is different from claiming public rights under the public trust doctrine to the scenic beauty of non-navigable shoreland. Yet, the DNR has taken the position that the public trust doctrine protects a public right to "scenic beauty (which on its face extends to the shore above the OHWM)."

¶90 Article IX, Section 1, does not vest the state with constitutional trust powers to "protect" scenic beauty by regulating non-navigable land bordering lakes and rivers. As will be noted, the state may have statutory authority to weigh in on scenic beauty beyond its public trust jurisdiction, but giving the state constitutional trust power to regulate "scenic beauty" would arguably give the state authority to regulate any private land that could be seen from navigable waters.

---

[32] In Just v. Marinette County, 56 Wis. 2d 7, 201 N.W.2d 761 (1972), the state correctly argued in its brief to this court that the public trust doctrine requires the legislature to preserve the trust in navigable waters: "The carrying out of that duty requires not only a promotion of navigation . . . but the protection and preservation of the incidents to navigation such as hunting, fishing, recreation, and scenic beauty, as they are defined in Muench v. Public Service Comm[ission] (1952), 261 Wis. 492, 53 N.W.2d 514, 55 N.W.2d 40." (Emphasis added.)

41

¶91 Public trust jurisdiction has always been confined to a limited geographic area.  In Diana Shooting Club, the court said:

> Hunting on navigable waters is lawful when it is confined strictly to such waters while they are in a navigable stage, and between the boundaries of ordinary high-water marks.  When so confined it is immaterial what the character of the stream or water is.  It may be deep or shallow, clear or covered with aquatic vegetation.  By ordinary high-water mark is meant the point on the bank or shore up to which the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction of terrestrial vegetation, or other easily recognized characteristic.  Lawrence v. Am. W[riting] P[aper] Co., 144 Wis. 556, 562, 128 N.W. 440 [(1910)].  And where the bank or shore at any particular place is of such a character that it is impossible or difficult to ascertain where the point of ordinary high-water mark is, recourse may be had to other places on the bank or shore of the same stream or lake to determine whether a given stage of water is above or below ordinary high-water mark.

Diana Shooting Club, 156 Wis. at 272; see also Bilot, 109 Wis. at 425.

¶92 The Diana Shooting Club holding was reaffirmed in Trudeau, 139 Wis. 2d at 104, where the court stated that "Lake Superior is navigable and if the non-navigable site is a part of the lake, then the land below the OHWM is held in trust for the public." (Emphasis added.).  See also McDonald Lumber Co., 18 Wis. 2d at 176-77; Houslet v. DNR, 110 Wis. 2d 280, 286, 329 N.W.2d 219 (Ct. App. 1982) ("[T]he OHWM marks the boundary between lake bed titled in the state, which is subject to state regulation in the public interest, and property titled in private owners.").

42

¶93 The limitation thus stated in the cases is clearly inconsistent with the interpretation of the public trust doctrine espoused by the DNR.

¶94 In sum, we believe the District has raised legitimate concerns about the DNR's reliance upon the public trust doctrine as authority for some of its regulation in this case.

2. Police Power as a Basis for Protecting Water Resources

¶95 This review of the constitutionally based public trust doctrine does not disarm the DNR in protecting Wisconsin's valuable water resources. For instance, the DNR has broad statutory authority grounded in the state's police power to protect wetlands and other water resources. See Just, 56 Wis. 2d at 10-11. This police power is sometimes buttressed by requirements imposed by federal law. Moreover, the agency has explicit statutory authority in this case to consider the impact of the water levels of Lake Koshkonong on public and private wetlands adjacent to the lake, Wis. Stat. § 31.02(1), because it has police power authority to "protect . . . property."

¶96 The Just case is a textbook example of using the state's police power to support legislation "to protect navigable waters and the public rights therein from the degradation and deterioration which results from uncontrolled use and development of shorelands." Id. at 10. The Wisconsin Legislature approved the Water Quality Act of 1965 by Chapter 614, Laws of 1965. The Act authorized the passage of shoreland zoning ordinances by counties, subject to certain requirements. Marinette County passed such an ordinance. It later prosecuted

43

Ronald Just for filling in wetlands on his shoreland property without a required permit.  Id. at 14.

¶97 When the case reached the supreme court, the court explained that the real issue was whether "the conservancy district provisions and the wetlands-filling restrictions are unconstitutional because they amount to a constructive taking of the Justs' land without compensation."  Id.

¶98 Marinette County and the state argued that the contested provisions constituted "a proper exercise of the police power of the state and do not so severely limit the use or depreciate the value of the land as to constitute a taking without compensation."  Id.  The state's principal argument in its brief had been that "[t]he Marinette County Shoreland Zoning Ordinance Is A Valid Police Power Regulation."  The state explained that the purpose of the ordinance was not intended to "preserve wetlands in their natural state.  The basic purpose of the ordinance is the protection of navigable waters, and the public rights therein, from the degradation and deterioration which results from the uncontrolled use and development of shorelands."  The state said:

> It has long been the law in Wisconsin that laws and regulations to prevent pollution and protect the waters of the state from degradation are valid police power enactments. . . .  The basis for such police power regulation is the legislature's duty to promote the general health, safety and welfare and to protect and preserve the public trust in navigable waters of the State of Wisconsin.
>
>     . . . .

44

The ordinance should . . . be upheld as a valid police power regulation.

The court then responded in the Just opinion as follows:

The protection of public rights may be accomplished by the exercise of the police power unless the damage to the property owner is too great and amounts to a confiscation.  The securing or taking of a benefit not presently enjoyed by the public for its use is obtained by the government through its power of eminent domain.  The distinction between the exercise of the police power and condemnation has been said to be a matter of degree of damage to the property owner.  In the valid exercise of the police power reasonably restricting the use of property, the damage suffered by the owner is said to be incidental.  However, where the restriction is so great the landowner ought not to bear such a burden for the public good, the restriction has been held to be a constructive taking even though the actual use or forbidden use has not been transferred to the government so as to be a taking in the traditional sense.

Id. at 15.

¶99  The court's emphasis on the state's police power is evident in the following passages:

This case causes us to re-examine the concepts of public benefit in contrast to public harm and the scope of an owner's right to use of his property.  In the instant case we have a restriction on the use of a citizen['s] property, not to secure a benefit for the public, but to prevent a harm from the change in the natural character of the citizens' property. . . . What makes this case different from most condemnation or police power zoning cases is the interrelationship of the wetlands, the swamps and the natural environment of shorelands to the purity of the water and to such natural resources as navigation, fishing, and scenic beauty.  Swamps and wetlands were once considered wasteland, undesirable, and not picturesque.  But as the people became more sophisticated, an appreciation was acquired that swamps and wetlands serve a vital role in nature, are part of the balance of nature and are essential to the

45

purity of the water in our lakes and streams. Swamps and wetlands are a necessary part of the ecological creation and now, even to the uninitiated, possess their own beauty in nature.

. . . .

The exercise of the police power in zoning must be reasonable and we think it is not an unreasonable exercise of that power to prevent harm to public rights [in navigable waters] by limiting the use of private property to its natural uses.

. . . .

Wisconsin has long held that laws and regulations to prevent pollution and to protect the waters of this state from degradation are valid police-power enactments.

Id. at 16-18.[33]

¶100 If there is any question that the court was not relying on the public trust doctrine to sustain the shoreland zoning ordinance and its authorizing legislation, the court noted that the Marinette County ordinance applied to "lands within 1,000 feet of the normal high-water elevation of navigable lakes, ponds, or flowages and 300 feet from a navigable river or stream." Id. at 10. These dimensions far exceed the geographic limitations of public trust jurisdiction. It should be obvious that the state does not have constitutional public trust jurisdiction to regulate land a distance of more than three football fields away from a navigable lake or pond.

---

[33] "In Just we upheld, as a valid exercise of the police power, Marinette County's shoreland zoning ordinance against a challenge that the ordinance amounted to a constructive taking of the Just[s'] land without compensation." M&I Marshall & Ilsley Bank v. Town of Somers, 141 Wis. 2d 271, 286, 414 N.W.2d 824 (1987) (emphasis added).

¶101 The police power is potent, and legislation grounded in the state's police power is presumed constitutional and will be sustained unless it is deemed unconstitutional beyond a reasonable doubt.    Nonetheless, as Just makes clear, the distinction between the DNR's constitutionally based public trust authority and the DNR's police power-based statutory authority is that the latter is subject to constitutional and statutory protections afforded to property, may be modified from time to time by the legislature, and requires some balancing of competing interests in enforcement.

¶102 Wisconsin Stat. § 31.02(1) also makes a distinction between the DNR's public trust authority and its police power authority.    Only part of Wis. Stat. § 31.02(1) embodies the public trust doctrine. See Wis. Power & Light Co. v. Pub. Serv. Comm'n, 5 Wis. 2d 167, 174, 92 N.W.2d 241 (1958) (stating that language in § 31.02 "promot[ing] safety . . . and . . . protect[ing] property" "involve[s] subjects covered by the police power of the state").

¶103 If the statute read only that the department "in the interest of public rights in navigable waters," may regulate and control the level and flow of water in all navigable waters, the statute would be seen as a direct enforcement mechanism for the public trust in navigable waters.    But the statute does more. It contains a disjunctive element giving the department authority to regulate and control the flow of water in all navigable waters "to promote safety and protect life, health and property."    Wis. Stat. § 31.02(1).    Because the quoted language

47

follows the key word "or," the department is given distinct and different authority to consider interests affected by the level of the "navigable waters."

   3. The History of Wis. Stat. § 31.02(1) and Application

¶104 Wisconsin Stat. § 31.02(1) originated in Section 3, Chapter 380, Laws of 1915.  The "or" between the words "the interest of public rights in navigable waters" and the words "to promote safety and protect life, health and property" was present in the beginning in relation to the power to control water levels.  See Wis. Stat. ch. 69m., § 1596——2.1. (1915) (created by Section 3 of Chapter 380, Laws of 1915).

¶105 By contrast, Wis. Stat. ch. 69m., § 1596——7.3. (1915), created by the same section of ch. 380, directs the Railroad Commission to consider whether "the construction, operation or maintenance of the proposed dam will not materially obstruct existing navigation or violate other public rights and will not endanger life, health or property."  (Emphasis added.)

¶106 Both provisions distinguish "public rights" from other interests, and those other interests need not be in or part of navigable waters.  The section relating to the water level regulations appears to give the Railroad Commission some discretion about what it will consider; the other section requires consideration of multiple factors before permitting construction of a dam.

¶107 Clearly, both sections empower the Railroad Commission to consider water level effects on property.  Flooding was an obvious concern.  The early statutes contain frequent references

48

to flooding caused by dams.  We see no reason, however, why "property" would not include property rights generally, particularly riparian rights under common law.

¶108 The "bundle of rights conferred upon a property owner by virtue of his contiguity to a body of water, whether a lake or stream, are referred to as riparian rights." Mayer v. Grueber, 29 Wis. 2d 168, 174, 138 N.W.2d 197 (1965).  "It is clear in Wisconsin that the mere fact that one owns property abutting a natural body of water presumptively confers certain rights."  Id.; see also Stoesser v. Shore Drive P'ship, 172 Wis. 2d 660, 667, 494 N.W.2d 204 (1993).  We see no evidence that the legislature in 1915 intended to exclude riparian rights from the consideration of property in Wis. Stat. § 31.02(1).

¶109 Property abutting a natural body of water includes wetlands, which make up 12.4 miles of Lake Koshkonong's shoreline.  The District acknowledges that "privately owned wetlands are entitled to consideration as 'property' to be protected in establishing a water level order."  There can be no dispute that the DNR can consider water level impact on all adjacent property under Wis. Stat. § 31.02(1).

¶110 No property owner's riparian rights are absolute. They are balanced against the rights of other riparians and the public, particularly if they impinge upon public rights in navigable waters.  But the rights of all riparians must be considered in a water level determination.  The DNR may emphasize some rights over others in its water level determinations, and its exercise of discretion will normally be

49

upheld so long as it considers all property rights and so long as it does not accord some non-navigable land or water above the OHWM a <u>constitutional</u> preference as trust land over other property.

### C. Application of Water Quality Standards

¶111 We next turn to the District's contention that applying wetland water quality standards in a Wis. Stat. § 31.02(1) water level determination, specifically water quality standards in Wis. Admin. Code § NR 103,[34] is expressly prohibited by Wis. Stat. § 281.92.

¶112 The District asserts that the legislature delegated rule-making authority to the DNR in Chapter 614, Laws of 1965. Chapter 614 extensively revised then-Wis. Stat. ch. 144 of the statutes, giving what is now the DNR a directive to "adopt rules setting standards of water quality to be applicable to the waters of the state, recognizing that different standards may be required for different waters or portions thereof."[35] § 37, ch. 614, Laws of 1965.

---

[34] Chapter NR 103 was promulgated pursuant to Wis. Stat. § 281.15(2)(b), which authorizes the DNR to adopt rules for wetland water quality standards.

[35] Wisconsin Stat. § 144.025(2)(b) (1965), which is now Wis. Stat. § 281.15(1), read in full:

> The department shall adopt rules setting standards of water quality to be applicable to the waters of the state, recognizing that different standards may be required for different waters or portions thereof. Such standards of quality shall be such as to protect the public interest, which include the protection of the public health and welfare and the present and prospective future use of such waters

¶113 Chapter 614 defined "waters of the state":

> "Waters of the state" includes those portions of Lake Michigan and Lake Superior within the boundaries of Wisconsin, and all lakes, bays, rivers, streams, springs, ponds, wells, impounding reservoirs, marshes, watercourses, drainage systems and other surface or ground water, natural or artificial, public or private, within the state or its jurisdiction.

Wis. Stat. § 144.01(1) (1965).

¶114 The District asserts that:

> DNR erred as a matter of law in applying ch. NR 103. Those rules, which define wetland functions and values and are intended to be determinative of regulatory decisions, were promulgated under the authority of ch. 281.  But DNR's authority to apply rules promulgated under sec. 281.15 has always been limited by sec. 281.92, which provides: "Nothing in this chapter [ch. 281] affects ss. 196.01 to 196.79 or ch. 31."

Therefore, the District concludes, consideration of "public rights in navigable waters" in Wis. Stat. § 31.02(1) cannot include the application of water quality standards in Wis. Stat. ch. 281 and its underlying administrative code.  In effect, the District contends that nothing in Wis. Stat. ch. 281 affects Wis. Stat. ch. 31.[36]

---

for public and private water supplies, propagation of fish and aquatic life and wildlife, domestic and recreational purposes and agricultural, commercial, industrial and other legitimate uses.  In all cases where the potential uses of water are in conflict, water quality standards shall be interpreted to protect the general public interest.

[36] A March 27, 2006, memorandum from Patricia Ann Trochlell of the DNR——labeled Exhibit 850 at the contested case hearing—— appears to confirm the District's contention, as Trochlell wrote:

¶115 Once again, the text of Wis. Stat. § 31.02(1) authorizes the DNR to "regulate and control the level and flow of water in all navigable waters" in the interest of "public rights in navigable waters or to promote safety and protect life, health and property." Some of the "property" to be "protected" is wetlands, both public and private. How should the DNR square this with Wis. Stat. § 281.92?

¶116 The District's reading of these two statutes——that the DNR cannot <u>apply</u> wetland water quality standards in § NR 103 when making a § 31.02(1) water level determination——is not reasonable. The DNR should not be forced to ignore relevant statutes and its own administrative rules on <u>water</u> quality standards in making a <u>water</u> level determination. It should not be forced to disregard its recognized statewide statutory mission as well as its own property.[37]

---

> Questions have arisen regarding the department's authority to consider water quality standards for activities regulated under ch. 31. Ch. 281.92 provides: "Nothing in this subchapter affects ss. 196.01 to 196.79 or ch. 31.["] This means that the department cannot <u>apply</u> water quality standards such as NR 102 and NR 103 to dams regulated under ch. 31.

(Emphasis added.) However, Trochlell goes on to state that DNR's responsibility under Wis. Stat. § 31.02(1), "in the interest of public rights in navigable waters" and to "promote safety and protect life, health and property" requires DNR to "<u>consider</u> [effects] to wetlands under ch. 31 when evaluating water level impacts to wetlands." (Emphasis added.)

[37] <u>See</u> Wis. Stat. § 281.11 ("The [DNR] shall serve as the central unit of state government to protect, maintain and improve the quality and management of the waters of the state, ground and surface, public and private.").

52

¶117 The history of the two statutes at issue is enlightening.  As previously noted, Wis. Stat. § 31.02 was originally enacted in 1915 as Section 1596——2.1. of ch. 69m. § 3, ch. 380, Laws of 1915 (the Water Powers Act).  The statute in 1915 read: "The commission, in the interest of public rights in navigable waters or to promote safety and protect life, health and property is empowered to regulate and control the level and flow of water in all navigable waters."  Wis. Stat. ch. 69m, § 1596——2.1. (1915).  This section was renumbered in 1917 as Wis. Stat. § 31.02, as part of the newly created Wis. Stat. ch. 31.  § 3, ch. 474, Laws of 1917.  The new § 31.02 was entitled "Powers of the railroad commission" because the Railroad Commission was the state agency originally responsible for making water level determinations.

¶118 Wisconsin Stat. § 281.92 was first enacted in 1919, four years after the predecessor statute to Wis. Stat. § 31.02(1).  Section 1407m——1.(12) stated: "Nothing in this act shall be construed to alter, amend, repeal, impair, or affect any of the provisions of sections 1797m——1 to 1797m——109 or <u>of chapter 31 of the Wisconsin statutes</u>."  § 2, ch. 447, Laws of 1919 (emphasis added).  The state board of health originally had the responsibility for enforcing the predecessor to Wis. Stat. ch. 281.  <u>See generally</u> ch. 447, Laws of 1919.

¶119 Four years later, the latter statute was renumbered as Wis. Stat. § 144.12 and amended to read, "Nothing in this chapter shall be construed to affect the provisions of sections 1797m——1 to 1797m——109 or of chapter 31 of the statutes."  § 27,

53

ch. 448, Laws of 1923.  This section was renumbered as Wis.
Stat. § 144.27 in 1979, § 624, ch. 221, Laws of 1979, and
finally renumbered as the current Wis. Stat. § 281.92 in 1995.
1995 Wis. Act. 227, § 435.

¶120 The court of appeals looked at this history and made
the following observations:

> This statutory history shows that Wis. Stat.
> § 281.92 was originally adopted to demarcate the
> regulatory spheres of influence of the state Board of
> Health and the Railroad Commission; the Board of
> Health's water purification and water pollution
> prevention responsibilities were not to affect the
> authority of the Railroad Commission in dam regulation
> under Wis. Stat. ch. 31, and the Railroad Commission's
> responsibilities were not to affect the authority of
> the Board of Health in its sphere of regulation.

Rock-Koshkonong Lake Dist., 336 Wis. 2d 677, ¶60.  Now that both
Wis. Stat. ch. 281 and ch. 31 responsibilities fall to the DNR,
the court of appeals said, the District's reading of these two
statutes is illogical.  Id.

¶121 In our view, the effect of Wis. Stat. § 281.92 upon
Wis. Stat. § 31.02(1) cannot be so easily dismissed.  Wisconsin
Stat. § 281.92 has remained essentially intact for nearly a
century, including almost 50 years in which the DNR has had the
dual responsibility of enforcing Wis. Stat. chs. 31 and 281.
The DNR's jurisdiction in Wis. Stat. ch. 281 is broader and
different from its jurisdiction in Wis. Stat. ch. 31.  If the
purpose served by Wis. Stat. § 281.92 had ceased to exist, the
statute would probably have been amended or eliminated rather
than simply renumbered.

¶122 Ultimately, we must interpret both Wis. Stat. §§ 31.02(1) and 281.92 in a way that harmonizes the purposes of the two statutes. "Apparently conflicting provisions of law should be construed so as to harmonize them and thus give effect to the leading idea behind the law." Beard v. Lee Enters., 225 Wis. 2d 1, 15, 591 N.W.2d 156 (1999). Construing Wis. Stat. § 281.92 as forbidding the DNR from applying water quality standards when making a water level determination in the interest of "public rights in navigable waters" is too absolute. As the court of appeals stated, the more reasonable interpretation is that "nothing in the DNR's water protection responsibilities under ch. 281 and the associated administrative rules expands or restricts its responsibilities to set water levels under Wis. Stat. § 31.02(1)." Rock-Koshkonong Lake Dist., 336 Wis. 2d 677, ¶57. That interpretation harmonizes the statutes and "give[s] effect to" the idea behind both laws: that the DNR should not be straitjacketed when managing the water resources of this state. Beard, 225 Wis. 2d at 15.

¶123 The DNR may consider the water quality standards in Wis. Admin. Code § NR 103, promulgated under Wis. Stat. ch. 281, when making a Wis. Stat. § 31.02(1) water level determination. Full consideration of these standards is different from a requirement that the DNR always apply them in making a § 31.02(1) determination.

¶124 As we understand it, the DNR did not apply the § NR 103 wetland water quality standards in this case. Rather, the analysis in the ALJ's Decision stated that the DNR evaluated the

55

proposed water level increase in the District's Petition "against the appropriate regulatory standards, including chapter NR 103, Wis. Admin. Code."

¶125 Therefore, we conclude that the DNR may <u>consider</u> wetland water quality standards in Wis. Admin. Code § NR 103 when making a water level determination under Wis. Stat. § 31.02(1). Wisconsin Stat. § 281.92 does not preclude the DNR from applying the wetland water quality standards in § NR 103 or other parts of ch. 281, when appropriate, after weighing factors under § 31.02(1).

### D. Consideration of Economic Impacts

¶126 We turn now to the District's final contention that it was wrong as a matter of law for the DNR to exclude most of the evidence of economic impacts at the contested case hearing. The District argues that the requirement in Wis. Stat. § 31.02(1) to "protect . . . property" should be broadly interpreted so as to consider the effect of proposed water levels on residential property values, business income, and local tax revenue. The DNR, on the other hand, asserts that it properly interpreted "protect . . . property" to include consideration of only the direct "hydrologic impacts" to real property like flooding and the impacts on the utility and enjoyment of riparian access rights.

¶127 Statutory interpretation starts with the text of the statute. <u>State ex rel. Kalal v. Circuit Court for Dane Cnty.</u>, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. "If the meaning of the statute is plain, we ordinarily stop the

56

inquiry."    Id.    However, if a statute is ambiguous——that is, "capable of being understood by reasonably well-informed persons in two or more senses"——then a reviewing court may turn to scope, history, context, and purpose of the statute.    Id., ¶¶47-48.

¶128 Wis. Stat. ch. 31 does not define "property."[38]   If the legislature does not provide a definition, we may resort to dictionaries.    DOR v. River City Refuse Removal, Inc., 2007 WI 27, ¶46, 299 Wis. 2d 561, 729 N.W.2d 396.    However, dictionary definitions are not especially helpful to us in this case.    See, e.g., The American Heritage Dictionary of the English Language 1452 (3d ed. 1992) (defining "property" as "1.a.  Something owned; a possession.  b.  A piece of real estate . . . c. Something tangible or intangible to which its owner has legal title"); Black's Law Dictionary 1232 (7th ed. 1999) (defining "property" as "The right to possess, use, and enjoy a determinate thing").

¶129 Regardless of how property is defined, certain rights are traditionally associated with property ownership.    These are known as the "bundle of rights" and commonly include the right "to possess, use and dispose" of the property, among other

---

[38] As one legal scholar put it, "What is property?  Nearly every first-year property course [in law school] begins and ends with this query.    The instructor never answers the question. . . .    The question is unanswerable because the meaning of the chameleon-like word property constantly changes in time and space."    John Edward Cribbet, Concepts in Transition: The Search for a New Definition of Property, 1986 U. Ill. L. Rev. 1, 1.

rights.    Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435–36 (1982) (citation and internal quotation marks omitted); see also Mitchell Aero, Inc. v. City of Milwaukee, 42 Wis. 2d 656, 662, 168 N.W.2d 183 (1969) ("Ownership is often referred to in legal philosophy as a bundle of sticks or rights."); Denise R. Johnson, Reflections on the Bundle of Rights, 32 Vt. L. Rev. 247, 253 (2007) (listing 11 incidents of full ownership in property, including inter alia, the right to possess, the right to use, the right to manage, the right to the income, the right to capital, and the right to alienate); A.M. Honoré, Ownership, in Oxford Essays in Jurisprudence, 107, 112–24 (A.G. Guest ed., 1961).

¶130 In this case, we must determine whether the DNR must consider the effects of a water level determination on the economic incidents of "property."    The meaning of the word "property," as used in Wis. Stat. § 31.02(1), is not clear on its face in the context presented.    Thus, the word is ambiguous, as the court of appeals initially concluded in its certification to this court.

¶131 What does the word "protect" mean?    Again, no definition of the term exists in Wis. Stat. ch. 31.    Definitions in a standard dictionary are only marginally helpful.    The American Heritage Dictionary of the English Language 1456 (3d ed. 1992) (defining "protect" as "1. To keep from being damaged, attacked, stolen, or injured; guard.").

¶132 Given the lack of a plain meaning of "protect . . . property," we must look further to interpret this

phrase.  We find that history, purpose, precedent, and the DNR's past practice support a broad interpretation of the phrase "protect . . . property" so that the DNR is not limited to consideration of hydrologic damage to real property and riparian rights when making a water level determination under Wis. Stat. § 31.02(1).

¶133 The construction and operation of dams, the water levels upstream caused by dam placement, and a network of navigable waters have played an important role in Wisconsin's economic development since early statehood.  See, e.g., Joseph A. Ranney, Trusting Nothing to Providence: A History of Wisconsin's Legal System 137 (1999) (discussing the use of dams for lumber mills and transportation of goods on navigable waters in nineteenth-century Wisconsin).  The territorial legislature recognized the role that dams and streams played in economic development with its passage of the Milldam Act.  DNR Waterway and Wetland Handbook, ch. 140 Dams, at 2 (stating that the purpose behind legislative regulation of dams was to "encourage economic development").

¶134 This court also recognized the economic impacts of dams and the resulting sustained water levels on impounded bodies of water.  In Fisher v. Horicon Iron & Manufacturing Co., this court, in considering the constitutionality of the Milldam Act, noted that "enterprising towns and flourishing villages have grown up" around dams and depend upon the dams for their "wealth and prosperity."  Fisher, 10 Wis. 293 (*351), 297 (*354) (1860).  In Smith v. Youmans, this court similarly recognized an

interest that residential riparian owners acquired in higher lake levels behind a dam maintained over a 40-year period. Smith, 96 Wis. 103, 109, 70 N.W. 1115 (1897).  These higher lake levels led property owners to build summer homes, summer resorts, and make other "sundry valuable improvements" on lake lots.  Id. at 106 (statement of facts).  While these acts and cases predate Wis. Stat. § 31.02, the history is instructive as to the role dams and water levels played in economic development.

¶135 In 1909 the legislature created a joint Special Legislative Committee on Water Powers, Forestry, and Drainage. A.J.R. 8, Laws of 1909.  Two members of this joint committee, state Senators Paul O. Husting and Henry Krumrey, issued a report to the governor and legislature detailing their observations of impounded lakes while touring the state with the joint committee:

> Summer resorts have sprung up along the lake shores and summer homes have been built by people from various parts of the state and of the United States. Piers have been built into the lakes and other improvements made by the riparian.  By reason thereof the shores are beginning to become very valuable and property rights are becoming important.

Spec. Legis. Comm. on Water Powers, Forestry, and Drainage, 49th Leg., Minority Rep. of Senators Paul O. Husting and Henry Krumrey, at 24 (Wis. 1910).  The report of the full committee was even more expansive in its discussion of water power, the resulting reservoirs of water and their importance to industry, residential riparians, and commercial recreation interests.  See

generally Rep. of the Comm. on Water Powers, Forestry, and Drainage of the Wis. Leg. 1910, 49th Leg.  For example, the committee report noted that impounded waters behind dams created very favorable conditions for summer cottages on lake banks and launches for tourists and hunters.  Id. at 27.

¶136 The special legislative committee's full report resulted in the Water Powers Acts of 1911, 1913, and 1915.  DNR Waterway and Wetland Handbook, at 4.  The 1915 Water Powers Act survived, while this court found the former two acts to be unconstitutional.[39]  The 1915 act included the requirement that the then-Railroad Commission protect property when setting water levels.  Wis. Stat. ch. 69m., § 1596——2. (1915).  In 1917 the legislature renumbered the Water Powers Law as Wis. Stat. ch. 31, with its requirement to protect property as it survives today.  § 3, ch. 474, Laws of 1917.  In light of the legislative reports giving rise to the Water Powers Act containing the "protect . . . property" language of Wis. Stat. § 31.02(1), one can reasonably infer that riparian residential property and lake-based businesses were prime considerations for protecting property.

---

[39] Chapter 652, Laws of 1911 (the 1911 Water Powers Act) was found unconstitutional as a taking of private property without compensation.  State ex rel. Wausau St. R.R. Co. v. Bancroft, 148 Wis. 124, 134 N.W. 330 (1912).  The 1913 Water Powers Act (ch. 755, Laws of 1913) was found unconstitutional because it did not provide adequate due process.  State ex rel. Owen v. Wis.-Minn. Light & Power Co., 165 Wis. 430, 162 N.W. 433 (1917).

¶137 One of the first cases to interpret the new requirement to protect property was <u>Town of Bear Lake v. Wisconsin-Minnesota Light & Power Co.</u>, 16 W.R.C.R. 710 (1915). In that case, riparian property owners brought a complaint to the Railroad Commission over a plan for a new dam that the owners claimed would cause flooding, destroying town highways and "rendering valu[e]less much taxable property therein." <u>Id.</u> at 710. The Railroad Commission held that property to be protected from overflow was not limited to land downstream from a dam, but applied upstream as well. <u>Id.</u> at 717. Furthermore, the respondent power company urged the Railroad Commission to accept an expansive view of property in the Water Powers Act; namely, the property interests in a water level determination are "of sufficient magnitude and importance to the community or the state as to make those property interests a matter of public concern." <u>Id.</u> at 719. Notably, while the decision discussed the location of property to be protected and the importance of property to the community, the decision did not explicitly limit the protection of property to only direct physical impacts.

¶138 Another early Railroad Commission case discussing the protection of property in the context of a water level determination is informative. In <u>In re Determining the High Water Mark to be Established on the Rest Lake Reservoir Operated by the Chippewa & Flambeau Improvement Co.</u>, riparian residents opposed the raising of water levels on the Rest Lake reservoir because it would result in "injury to their property." 16 W.R.C.R. 727, 731 (1915). The Railroad Commission recognized

that the waters of the affected area were "among the most famous summer resort and fishing waters in the state." Id. at 733. Residents and resort owners invested "large sums of money" in improvements on the waters. Id. at 733-34. The Railroad Commission held:

> We are of the opinion that the Commission is required to take into consideration the effect of [water] levels fixed by it upon property which may be affected by those levels and that where the property to be so affected includes the most valuable property in the community, is large in acreage, and not shown to be subject to overflow, the protection of such property is a matter of more than private interest and becomes a matter affecting the public welfare.

Id. at 736.[40] Thus, the Railroad Commission in Rest Lake made a direct link between protecting property in a water level determination and economic damage to valuable land. While initially the potential damage was physical in nature (overflowing of land), the Commission was mindful of the

---

[40] This court affirmed the Rest Lake water level order in Chippewa & Flambeau Improvement Co. v. Railroad Commission of Wisconsin, 164 Wis. 105, 159 N.W. 739 (1916).

The DNR correctly notes that this court's opinion in Chippewa & Flambeau used the words "imperil[]," "injury," and "damage" in relation to property. Id. The DNR argues that these words "connote direct harm to property, not economic harm to property values or taxes or business." We decline the invitation to take such a narrow view of these words. While one can certainly suffer physical injury, one can also undergo economic or financial injury as well, particularly as a result physical damage. See, e.g., U.S. Small Bus. Admin., Economic Injury Disaster Loans, http://www.sba.gov/content/economic-injury-disaster-loans (last visited July 8, 2013).

improvements to the land that increased its value and that the value would no doubt be affected by the level of the water.[41]

¶139  It is unreasonable to conclude, given the preceding history, context, and interpretations of the phrase "protect . . . property," that economic impacts cannot be considered when making a water level determination under Wis. Stat. § 31.02(1).  The DNR, the agency currently charged with making a water level determination under § 31.02(1), must protect the same property interests as in 1915 and before—that is, not only land itself, but improvements to the land, the

---

[41] The DNR and court of appeals look to this court's decision in City of New Lisbon v. Harebo, 224 Wis. 66, 271 N.W. 659 (1937) for support that "protect . . . property" applies only to the protection of property from events like flooding. Rock-Koshkonong Lake Dist., 336 Wis. 2d 677, ¶45.  We disagree. Harebo was about whether a permit for dam construction under Wis. Stat. § 31.06(3) (1935) was required before condemnation proceedings for flowage rights.  Specifically, was condemnation of all the flowage rights necessary before the grant of a permit so as not to "endanger property"? Harebo, 224 Wis. at 70.

The Harebo court asked what is meant by property, and looked to Wis. Stat. § 31.02, which has "precisely the same formula" for protecting property as Wis. Stat. § 31.06(3) (1935).  Id. at 72.  The court concluded, "It is not proper to isolate the word 'property' and assert that injury to property means normal flowage by the ordinary operation of the dam, since this is the inevitable consequence of building and maintaining a dam."  Id. at 73.

The Harebo holding was limited to whether the Public Service Commission (at the time, the agency tasked with regulating flowage and water level) was required to protect property from being flooded by normal dam operation in the context of dam permit approval.  While this holding obviously implicates physical damage to property, it does not limit the protection of property solely to physical impacts such as flooding.

64

community's interest in the land, and investments in and capital derived from the land.   These property interests have not diminished in importance, but now they must be balanced against impacts on wildlife, water quality, wetlands, recreation, and other more modern considerations.

¶140 The DNR's own Waterway and Wetland Handbook has guidelines in place for economic considerations when regulating water levels under Wis. Stat. § 31.02(1).   DNR Waterway and Wetland Handbook, ch. 130, at 3 (stating that the DNR "may regulate and control water level and flow to: . . . Minimize economic losses resulting from too much or too little water"). We also note that the DNR considered economic impacts of water levels on Lake Koshkonong when it conducted an EA for the proposed 1982 water level order.[42]

¶141 Equally significant, the DNR's model shoreland zoning ordinance (which was adopted by Marinette County in 1967 and was at issue in the Just case) stated in the beginning and states now:

> 1.2  Findings of Fact.  Uncontrolled use of the shorelands and pollution of the navigable waters of _____ County will adversely affect the public health, safety, convenience, and general welfare and impair the tax base.  The legislature of Wisconsin has delegated responsibility to the counties to further the maintenance of safe and healthful conditions; prevent and control water pollution; protect spawning grounds, fish and aquatic life; control building

---

[42] The Environmental Impact Assessment Screening Worksheet for the proposed 1982 water level order discussed how "taverns, marinas, bait dealerships" and other commercial establishments "will benefit from a stable recreational pond."

> sites, placement of structures and land uses; and to preserve shore cover and natural beauty. This responsibility is hereby recognized by _____ County, Wisconsin.

Wis. Dep't of Natural Res., A Model County Shoreland Zoning Ordinance for Wisconsin's Shoreland Protection Program at 5 (June 2010, rev. Dec. 2010) (emphasis added). This was explicitly acknowledged by the Just court: "The Marinette county shoreland zoning ordinance in secs. 1.2 and 1.3 states the uncontrolled use of shorelands and pollution of navigable waters . . . affect public health, safety, convenience, and general welfare and impair the tax base." Just, 56 Wis. 2d at 11 (emphasis added). Reference to the tax base is generally included in county shoreland zoning ordinances. See, e.g., Dane Cnty., Wis., Code of Ordinances § 11.016(1) (2013); Marinette Cnty., Wis., Code of Ordinances § 21.01(2) (2013); Code of Ordinances, Rock Cnty., Wis. § 4.201(2) (2013). Consequently, the DNR's stated position in the present case——disavowing any consideration of the effects of water levels on the tax base——is directly contrary to the statutory and case law authority it relies on in the Decision.

¶142 In this case, the DNR considered riparian access and enjoyment when making the water level determination for Lake Koshkonong under Wis. Stat. § 31.02(1) but excluded testimony on economic impacts of lower water levels on both riparian and non-riparian property owners and communities in close proximity to the lake. At oral argument, the DNR claimed that economic

66

interests were subsumed into the admitted testimony on riparian interests.

¶143 The DNR's Decision and current position relies on this court's previous opinion in Wisconsin's Environmental Decade when it characterized the evidence of economic impacts as "secondary or indirect economic impacts."[43] In that case, the court held that the DNR did not need to consider socioeconomic impacts in determining whether to issue an EIS in connection with Wis. Stat. ch. 30 permits. Wis.'s Envtl. Decade, 115 Wis. 2d at 395.

¶144 We disagree with the DNR's application of Wisconsin's Environmental Decade to this case. First, the alleged socioeconomic injuries in that case——a possible decline in downtown Appleton's business because of a new shopping mall outside of the city——did not have "a direct causal relationship to the minor changes to the physical environment found by the DNR." Id. at 404. Here, the decision to raise or lower water levels has a direct economic impact on the riparian community. Second, the case before us is not about issuing an EIS; this

---

[43] Yet, the DNR did not exclude evidence of secondary economic loss entirely; the ALJ admitted testimony on the loss of board feet of green ash and diminished crop yields in drainage districts. In fact, the testimony of diminished crop yields that would result from higher waters is an explicit finding of fact in the Decision.

It is inconsistent for the DNR to consider the economic impacts of higher water level proposals like these, but refuse to consider economic impacts from lower water levels under the current order.

67

case is about what the DNR should consider in protecting property, as directed by Wis. Stat. § 31.02(1), when making a water level determination.

¶145 It is important to note that the economic testimony excluded at the contested case hearing supplemented the testimony of residents and business owners that the ALJ allowed to stay in. In other words, the excluded testimony was different from the testimony that the ALJ accepted. The included testimony spoke to how long the piers of lake-based businesses have to be in order to make effective use of navigable water, while the excluded expert testimony of John Stockham spoke to the money lost by these businesses with water levels on Lake Koshkonong reduced from their historical levels. The included testimony covered riparian access and enjoyment, while the excluded testimony of Stockham and Dr. Kashian explained how property may have diminished in value or risen in value more slowly than comparable lake property because of the reduced access. The included testimony spoke to the natural scenic beauty, hunting, fishing, camping, and boating on and around Lake Koshkonong, while the excluded testimony talked about the overall economic impact that lower water levels would have on the community that depends on these enumerated activities——not only the impact on businesses but also on the municipalities that surround the lake. The DNR rightly considered the direct impact of lower water levels on riparian properties, but wrongly excluded the cumulative economic effect of the lower water levels on these properties. It is a familiar

principle of environmental law that secondary effects are often more substantial than the primary effects of an action.

¶146 The DNR asks how it would go about an economic analysis:[44]   How would it monetize the value of riparian property?  What would be its logical stopping point?  We do not hold that the DNR must consider remote economic impacts; a reasonableness standard should apply.  The DNR has discretion as to which impacts are too attenuated to consider,[45] and it can refute any economic evidence.  Moreover, evidence of economic impacts is not dispositive in a water level determination; hypothetically, on remand the DNR could still reject a petition for higher water levels on Lake Koshkonong even after considering the economic impacts of lower water levels on property.  However, it is clear that the DNR <u>must</u> consider the economic impacts in the first place.

---

[44] The DNR is capable of conducting an economic analysis in other contexts.  <u>See, e.g.,</u> Wis. Stat. §§ 285.01(12) and 227.137.  However, we are not requiring the DNR to conduct an economic analysis, per se.  We hold that the DNR must <u>consider</u> economic impacts to property when making a water level determination under Wis. Stat. § 31.02(1).

Furthermore, the DNR asserts that it cannot consider economic impacts like property values on a proposed higher water level order.  This assertion would produce an absurd result in the case of a proposed <u>lower</u> water level order.  The DNR's narrow interpretation of "protect . . . property" would mean that only direct physical impacts to property could be considered but no evidence of ruined property values or business receipts could be considered.

[45] It merits repeating that an ALJ must admit "all testimony having reasonable probative value, but shall exclude immaterial, irrelevant or unduly repetitious testimony or evidence."  Wis. Stat. § 227.45(1).

69

¶147 We make one further observation. Raising and lowering water levels, pursuant to Wis. Stat. § 31.02(1), is a classic example of government regulation. A regulation may severely diminish the value of property, but in a regulatory "taking" under the Fifth Amendment, the "regulation or government action 'must deny the landowner all or substantially all practical uses of a property in order to be considered a taking for which compensation is required.'" Eberle v. Dane Cnty. Bd. Of Adjustment, 227 Wis. 2d 609, 622, 595 N.W.2d 730 (1999). If the economic impact of government regulation is not considered at the time the regulation is initiated, when will it be considered?

¶148 We conclude that the DNR erred when it excluded testimony on economic impacts of lower water levels when making a water level determination under Wis. Stat. § 31.02(1).

### III. CONCLUSION

¶149 The DNR's conclusions of law are subject to de novo review because the DNR's water level order under Wis. Stat. § 31.02(1) is heavily influenced by the DNR's interpretation of the scope of its own powers, its interpretation of the Wisconsin Constitution, its disputed interpretation of the statute it utilized, and its reliance upon statutes and rules outside of Wis. Stat. ch. 31.

¶150 The DNR properly considered the impact of the Petition's proposed water levels on public and private wetlands in and adjacent to Lake Koshkonong. However, the DNR inappropriately relied on the public trust doctrine for its

70

authority to protect non-navigable land and non-navigable water above the ordinary high water mark.  The DNR has broad statutory authority grounded in the state's police power to protect non-navigable wetlands and other non-navigable water resources. Thus, the DNR may consider the water level impact on all adjacent property under Wis. Stat. § 31.02(1).

¶151 The DNR was entitled to consider the water quality standards in Wis. Admin. Code § NR 103, promulgated under Wis. Stat. ch. 281, when making a Wis. Stat. § 31.02(1) water level determination.  By statute, the DNR is responsible for writing and enforcing wetland water quality standards in this state. Accordingly, it would be unreasonable for the DNR to ignore statutes and its own administrative rules when making a water level determination affecting wetlands.  Therefore, the DNR may consider § NR 103 water quality standards when making a water level determination under Wis. Stat. § 31.02(1) that affects wetlands and may apply these standards when appropriate after weighing the factors in the statute.  However, Wis. Stat. § 281.92 suggests that the DNR is not <u>required</u> to apply ch. 281 standards in making a determination under Wis. Stat. § 31.02 because ch. 31 is excepted from the provisions of ch. 281.

¶152 The DNR erroneously excluded most testimony on the economic impact of lower water levels in Lake Koshkonong on the residents, businesses, and tax bases adjacent to and near Lake Koshkonong.  This evidence was relevant to the DNR's decision-making under Wis. Stat. § 31.02(1).  Although the DNR is granted substantial discretion in its decision-making under the statute,

71

it must consider all probative evidence when its decision is likely to favor some interests but adversely affect others.  In this case, the DNR's exclusion of most economic evidence was inconsistent with its acceptance of competing economic evidence that helped sustain its water level decision.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶153 N. PATRICK CROOKS, J. *(dissenting).* This case presents a question that the majority can——indeed does——answer by interpreting Wis. Stat. § 31.02(1) (2009-10). Yet the majority unnecessarily reaches out to the constitutional principle of the public trust doctrine from the Wisconsin Constitution, constricting the doctrine and misreading this court's precedent, especially the well-settled law articulated in Just v. Marinette County, 56 Wis. 2d 7, 201 N.W.2d 761 (1972). Wisconsin's long and robust history of protecting the public trust is widely acknowledged and respected. The public trust doctrine imposes on the state, as trustee, the affirmative duty to protect, preserve, and promote the public's right to Wisconsin's waters.

¶154 The majority opinion attempts to undermine this court's precedent, recharacterize its holdings, and rewrite history. Instead of limiting itself to addressing only what must be addressed, the majority seizes this opportunity to limit the public trust doctrine in an unforeseen way, transforming the state's affirmative duty to protect the public trust into a legislative choice. It needlessly unsettles our precedent and weakens the public trust doctrine that is enshrined in the Wisconsin Constitution. This represents a significant and disturbing shift in Wisconsin law.

¶155 The majority also errs in expanding the type of evidence that the Department of Natural Resources (DNR) must consider in these cases. A straightforward interpretation of

1

Wis. Stat. § 31.02(1) would not require the DNR to consider secondary or indirect economic impact when making water level determinations. The economic evidence admitted during the ten-day contested case hearing was sufficient to discharge the DNR's duty to "protect . . . property," and the excluded evidence was not relevant or required. The DNR has a difficult job to do under this statute, and in this case, the DNR did it well. The decisions of the DNR, the circuit court, and the court of appeals each properly concluded that § 31.02(1) does not require consideration of such secondary or indirect economic impact. The fact is that the DNR sufficiently considered the protection of property, and therefore, it was not error to strike the secondary or indirect economic evidence that it struck.

¶156 For these reasons, I respectfully dissent.

## I. WISCONSIN COURTS HAVE AGGRESSIVELY PROTECTED THE PUBLIC TRUST DOCTRINE.

¶157 To understand the significance and to see the potential implications of the majority's novel interpretation of the Just case, it is necessary to appreciate how settled the public trust doctrine has been in Wisconsin until now. This court highlighted the constitutional basis of the public trust doctrine in Muench v. Public Service Commission, 261 Wis. 492, 53 N.W.2d 514, aff'd on reh'g, 261 Wis. 492, 55 N.W.2d 40 (1952). In that case, the court traced the history of the public trust doctrine to the Northwest Ordinance of 1787. Muench, 261 Wis. at 499. The language from the Northwest

2

Ordinance of 1787 was then adopted by the territorial constitutional convention in 1848, approved by an act of Congress which admitted Wisconsin into the Union, and incorporated in the Wisconsin Constitution as follows:

> The state shall have concurrent jurisdiction on all rivers and lakes bordering on this state so far as such rivers or lakes shall form a common boundary to the state and any other state or territory now or hereafter to be formed, and bounded by the same; and the river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost or duty therefor.

Wis. Const. art. IX, § 1.

¶158 Early on, this court declared that the public trust not only required preservation of the trust, it also required promotion of it. City of Milwaukee v. State, 193 Wis. 423, 449, 214 N.W. 820 (1927) ("The equitable title to these submerged lands vests in the public at large, while the legal title vests in the state, restricted only by the trust, and the trust, being both active and administrative, requires the lawmaking body to act in all cases where action is necessary, not only to preserve the trust, but to promote it." (emphasis added)).

¶159 In Diana Shooting Club v. Husting, this court described the state's responsibilities under the public trust doctrine:

> The wisdom of the policy which, in the organic laws of our state, steadfastly and carefully preserved to the people the full and free use of public waters cannot be questioned. Nor should it be limited or curtailed by narrow constructions. It should be interpreted in the broad and beneficent spirit that gave rise to it

3

in order that the people may fully enjoy the intended benefits.

Diana Shooting Club, 156 Wis. 261, 271, 145 N.W. 816 (1914) (emphasis added).

¶160 The court in Muench adopted the language from Diana Shooting Club and demonstrated the growth of the public trust doctrine over time by describing its own holding as "keeping with the trend manifested in the development of the law of navigable waters in this state to extend the rights of the general public to the recreational use of the waters in this state, and to protect the public in the enjoyment of such rights." Muench, 261 Wis. at 512.

¶161 This court in Just v. Marinette County further interpreted the doctrine while upholding a shoreland zoning statute enacted pursuant to the state's public trust duty. The court stated:

> The active public trust duty of the state of Wisconsin in respect to navigable waters requires the state not only to promote navigation but also to protect and preserve those waters for fishing, recreation, and scenic beauty. To further this duty, the legislature may delegate authority to local units of the government, which the state did by requiring counties to pass shoreland zoning ordinances.

Just, 56 Wis. 2d at 18 (emphasis added) (citations omitted). This court explained that the purpose of the statute at issue in that case was to "protect navigable waters and the public rights therein from the degradation and deterioration which results from uncontrolled use and development of shorelands." Id. at 10. We noted that the stated purpose of the shoreland regulation program is to "aid in the fulfillment of the state's

4

role as trustee of its navigable waters and to promote public health, safety, convenience and general welfare." Id.

¶162 Since then this court has consistently reiterated the purpose and the significance of the public trust doctrine in its cases. For example, Wisconsin's Environmental Decade, Inc. v. DNR (Environmental Decade 1978), described the duties of the state under the public trust as "not only to promote navigation but also to protect and preserve its waters for fishing, hunting, recreation, and scenic beauty." Envtl. Decade 1978, 85 Wis. 2d 518, 526, 271 N.W.2d 69 (1978). We described the state's responsibility as long-acknowledged and highlighted the legislature's delegation of water management to the DNR in furtherance of "the state's affirmative obligations as trustee." Id. at 526-27.

¶163 Recently, this court reiterated these principles in Lake Beulah Management District v. DNR, holding that under the applicable statutes and the public trust duties, the DNR can and must consider whether an inland well would harm waters of the state before issuing a permit for the well. Lake Beulah, 2011 WI 54, ¶3, 335 Wis. 2d 47, 799 N.W.2d 73. This court explained jurisprudence on the public trust doctrine:

> We reaffirmed this maxim in Muench v. Public Service Commission in our examination of the history and evolution of the public trust doctrine, which indicated a "trend to extend and protect the rights of the public to the recreational enjoyment of the navigable waters of the state." We have further explained, "The trust doctrine is not a narrow or crabbed concept of lakes and streams."

Id., ¶31 (emphasis added) (citations omitted).

¶164 Our cases demonstrate that the scope of the public trust doctrine is such that the state holds title to the land between the ordinary high water marks, and state regulation consistent with the public trust doctrine extends to surrounding areas. The ownership of land was emphasized in Diana Shooting Club, which was a case about trespass. In that case, there was no trespass because the hunter was hunting between the ordinary high water marks, land that was held in trust for the public. Diana Shooting Club, 156 Wis. at 272. In contrast, regulation consistent with the public trust doctrine was at issue in Just because the shoreland zoning statute extended well beyond the ordinary high water mark, and the court held that it could be regulated pursuant to the public trust doctrine. Just, 56 Wis. 2d at 14, 17.

¶165 In furtherance of the state's trustee responsibilities, the legislature has enacted statutes to discharge its duties. As the court explained in Environmental Decade 1978, several chapters of the Wisconsin statutes, including Chapter 31, which is at issue in this case, were enacted "[i]n furtherance of the state's affirmative obligations as trustee of navigable waters." 85 Wis. 2d at 527. We dealt with a similar situation in this court's unanimous decision in Lake Beulah, where the legislature had used a statute to implement its public trust duties. This court stated, "[W]e conclude that, through Wis. Stat. §281.11 and § 281.12, the legislature has delegated the State's public trust duties to the DNR in the context of its regulation of high capacity wells and

6

their potential effect on navigable waters such as Lake Beulah." Lake Beulah, 335 Wis. 2d 47, ¶34 (emphasis added). That decision dealt with non-navigable water, and explained its relationship to the public trust doctrine. The statutes created to preserve and promote the public trust doctrine allowed the regulation of non-navigable waters because of the potential effects non-navigable waters have on navigable waters.

## II.  THE MAJORITY UNNECESSARILY UNDERMINES WELL-SETTLED LAW ON WISCONSIN'S PUBLIC TRUST DOCTRINE.

¶166 The heart of the public trust doctrine lies in protecting, preserving, and promoting the public's right to Wisconsin's waters, and this court has vigilantly guarded these rights. The public trust doctrine entrusts to the state the duty to protect, preserve, and promote the public trust. The majority untethers our constitutional jurisprudence from its foundation and attempts to transform 165 years of constitutional precedent into a mere legislative exercise of the state's police power. The citizens of Wisconsin may rightly wonder why the majority is limiting the protection of Wisconsin's waters and reaching a constitutional question that is not essential to its holding. I refuse to unnecessarily constrict our holdings on

this important constitutional doctrine, especially in a case that should be decided on statutory grounds.[1]

¶167 The central issue in this case is one of statutory interpretation——namely, whether the DNR can consider wetlands above the ordinary high water mark when determining water levels under Wis. Stat. § 31.02(1). Wisconsin Stat. § 31.02(1) states in relevant part: "The department, in the interest of public rights in navigable waters or to promote safety and protect life, health and property[,] may regulate and control the level and flow of water in all navigable waters . . . ." Both the majority and the petitioner agree that a simple reading of § 31.02(1) demonstrates that the statute allows for consideration of private wetlands. In fact, the majority

---

[1] Two other issues are decided by the majority. The first is the standard of review. The majority lays out the appropriate framework to determine the standard of review. It then determines that the standard of review here should be de novo review because it believes that the DNR has not consistently interpreted Wis. Stat. § 31.02(1) and that the question presented is one of the scope of the DNR's power. Majority op., ¶¶58-64. Because I would reach the same result under any level of deference, I will not address the majority's application of the oft-cited rules from Racine Harley-Davidson, Inc. v. State, 2006 WI 86, 292 Wis. 2d 549, 717 N.W.2d 184. See also Hilton ex rel. Pages Homeowners' Ass'n v. DNR, 2006 WI 84, 293 Wis. 2d 1, 717 N.W.2d 166 (discussing the standard of review of an agency decision in a case related to the public trust doctrine). Even applying de novo review, the DNR's interpretations were reasonable and should therefore be affirmed.

The second issue decided by the majority is whether Wis. Stat. § 281.92 bars the DNR from considering water quality standards from Wis. Admin. Code § NR 103 when making its determination under § 31.02(1). I agree with the majority that Wis. Stat. § 281.92 does not bar the DNR from such a consideration.

states: "The District acknowledges that 'privately owned wetlands are entitled to consideration as "property" to be protected in establishing a water level order.' There can be no dispute that the DNR can 'consider' water level impact on all adjacent property under Wis. Stat. § 31.02(1)." Majority op., ¶109. Because that interpretation is dispositive of the issue, I would stop the analysis there.

¶168 Instead, the majority reaches that conclusion and then embarks on a constitutional analysis in which it reads the part of the statute before the "or" to be a direct enactment of the public trust doctrine and the part after the "or" as an exercise of police powers. Majority op., ¶¶102-103. It speculates as to how the statute could have been written so it "would be seen as a direct enforcement mechanism for the public trust in navigable waters" while explaining that the actual language could not be a direct enforcement mechanism. Majority op., ¶103. The majority does not cite any cases that interpret Wis. Stat. § 31.02(1) the way it does now, and it ignores the cases that suggest that the entire statute is an embodiment of the public trust doctrine.[2] Reading the statute as the majority does attempts to strip the state, trustee of the public trust doctrine, of the ability to regulate anything that is not between the ordinary high water marks pursuant to the public trust doctrine. The majority reaches a constitutional issue that it is not required to reach,

---

[2] See discussion of Wisconsin's Environmental Decade, Inc., v. DNR (Environmental Decade 1978), 85 Wis. 2d 518, 271 N.W.2d 69 (1978) and Lake Beulah Management Dist. v. DNR, 2011 WI 54, 335 Wis. 2d 47, 799 N.W.2d 73, at ¶165.

and it engages in a strained analysis to bolster its holding. Both Wis. Stat. § 31.02(1) and the long-settled public trust doctrine support a consideration of the impact on wetlands adjacent to Lake Koshkonong when regulating water levels pursuant to the public trust doctrine.

¶169 To support its holding, the majority misconstrues Just v. Marinette County. The majority calls the Just case "a textbook example of using the state's police power [as opposed to using the constitutional public trust doctrine] to support legislation 'to protect navigable waters and the public rights therein . . . .'" Majority op., ¶96. The majority uses this interpretation of Just to explain that the statute at issue here, § 31.02(1), is only half based on the public trust doctrine; the rest, as the majority would have us believe, derives only from the state's police power and is disconnected from the public trust doctrine. [3]

---

[3] Although it does not answer why it matters in this case, the majority leaves no doubt about the significance of its novel interpretation of the Just case, namely that it changes the ease with which the legislature can modify regulation and creates a more lenient legal standard for this court to apply when it reviews such changes:

> The police power is potent, and legislation grounded in the state's police power is presumed constitutional and will be sustained unless it is deemed unconstitutional beyond a reasonable doubt. Nonetheless, as Just makes clear, the distinction between the DNR's constitutionally based public trust authority and the DNR's police power-based statutory authority is that the latter is subject to constitutional and statutory protections afforded to property, may be modified from time to time by the legislature, and requires some balancing of competing interests in enforcement.

10

¶170 The clear language of <u>Just</u> rebuts the majority's conclusion that it was only a police power case.[4] The thrust of

_____

Majority op., ¶101. In other words, rights that are not protected by the constitution are easier to take away. In addition, the majority's interpretation transforms what was an affirmative duty on the state as trustee into a right to regulate when the legislature chooses to do so, allowing the state to ignore its duty with respect to things that impact navigable waters but are not physically located between the ordinary high water marks.

[4] Scholarship interpreting <u>Just</u> supports the conclusion that this court extended the public trust doctrine through <u>Just</u> to allow for regulation above the ordinary high water mark. <u>See, e.g.</u>, Melissa K. Scanlan, <u>Implementing the Public Trust Doctrine: A Lakeside View into the Trustees' World</u>, 39 Ecology L.Q. 123, 138 (2012) (explaining that "[a]s scientific knowledge about the interconnectedness of hydrology has increased, courts and the legislature have expanded the public trust doctrine to cover activities on shorelands, wetlands, nonnavigable waters, and groundwater adjacent to navigable waters."); Richard M. Frank, <u>The Public Trust Doctrine: Assessing Its Recent Past & Charting Its Future</u>, 45 U.C. Davis L. Rev. 665, 668 (2012) ("[I]n a controversial 1972 decision, the Wisconsin Supreme Court expressly [held] that the public trust doctrine could be asserted to bar the filling of privately-owned wetlands, in order to preserve those wetlands in their natural condition."); Jason J. Czarnezki, <u>Environmentalism and the Wisconsin Constitution</u>, 90 Marq. L. Rev. 465, 470, 494 (2007) (referencing <u>Just</u> to support a statement that the constitutionality of shoreland and wetland protection via zoning ordinances was upheld under the public trust doctrine and citing <u>Just</u> in concluding that "the constitution might textually embrace the notion that private property owners do not have inherent rights to change the 'essential natural character of their land' for development purposes.").

the Just opinion showed that the court believed it was relying on the public trust doctrine. The court explicitly held that land above the ordinary high water mark is subject to the public trust doctrine. Just, 56 Wis. 2d at 18-19 ("Lands adjacent to or near navigable waters exist in a special relationship to the state. They have been held subject to special taxation and are subject to the state public trust powers . . . ." (emphasis added) (citations omitted)).

¶171 In an attempt to circumvent the clear language of the Just case, the majority makes a circular argument. The majority imports its conclusion from earlier in the opinion——that the public trust does not extend beyond the ordinary high water

---

See also Paul G. Kent & Tamara A. Dudiak, Wisconsin Water Law: A Guide to Water Rights and Regulations 1, 12 (2d ed. 2001), http://learningstore.uwex.edu/assets/pdfs/g3622.pdf (stating that "because of the importance of public trust, the courts have used the public trust doctrine as a justification for regulation of shoreland and wetland areas adjacent to natural navigable waters on the theory that such regulation is necessary to protect public trust waters and to ensure the right of the public to access those waters." (citation omitted)); Melissa K. Scanlan, The Evolution of the Public Trust Doctrine and the Degradation of Trust Resources: Courts, Trustees and Political Power in Wisconsin, 27 Ecology L.Q. 135, 165 (2000) (citing Just in a section entitled "Cases in Which Trustees Acted to Further the Trust"); Patrick O. Dunphy, The Public Trust Doctrine, 59 Marq. L. Rev. 787, 807 (1976) (explaining Just, "The strong public trust doctrine in Wisconsin may have been the most significant reason for the court's initiative. . . . By recognizing the interrelationship of the land and the water and extending the trust to shorelands, the court has added a new dimension to the trust.")

mark——and applies it to support its subsequent conclusion.[5] Regarding Just, it states:

> If there is any question that the court was not relying on the public trust doctrine to sustain the shoreland zoning ordinance and its authorizing legislation, the court noted that the Marinette County ordinance applied to "lands within 1,000 feet of the normal high-water elevation of navigable lakes, ponds, or flowages and 300 feet from a navigable river or stream." These dimensions far exceed the geographic limitations of public trust jurisdiction.

Majority op., ¶100 (citation omitted). The majority's only apparent support for its conclusion about the dimensions of the public trust jurisdiction comes from its own earlier analysis. The Just case establishes the opposite conclusion——that the DNR pursuant to the public trust doctrine may consider the impact on land above the ordinary high water mark.

¶172 Not only does an appropriate interpretation of Just rebut the majority's conclusions, this court has repeatedly interpreted the public trust doctrine more broadly than the majority does today, and there is no compelling reason presented in this case to change that interpretation. See supra, ¶¶161-165. The case law indicates that the state has the power to regulate lands beyond the ordinary high water mark in discharging the duties entrusted to it under the public trust doctrine. See, e.g., Lake Beulah, 335 Wis. 2d 47, ¶34. Likewise, the cases demonstrate that the legislature has an

---

[5] For an explanation of why the majority mistakenly believes that the public trust doctrine cannot extend beyond the ordinary high water marks, see infra, ¶172.

13

affirmative duty as trustee to protect and promote the public trust. <u>See, e.g.</u>, <u>City of Milwaukee</u>, 193 Wis. at 449.

¶173 One explanation for the majority's puzzling holding is that it appears to confuse the concepts of ownership of (or title to) the land with regulation pursuant to the public trust doctrine. In the cases the majority cites to support its position that public trust jurisdiction is confined to limited geographic areas, the idea of <u>ownership</u> of the land was paramount, but here, ownership of the private wetlands is not at issue.[6] The issue is only whether the DNR has the authority under the public trust doctrine to consider the impact on those adjacent wetlands consistent with its duties under the public trust doctrine. After citing cases it believes support its proposition that the public trust doctrine is limited to water between the ordinary high water marks, the majority explains the problem it sees:

> Contemplating the question of ownership is important because the public trust doctrine implicates state ownership or virtual state ownership——by virtue of its trust responsibility——of <u>land</u> under navigable waters. If the public trust were extended to cover wetlands that are not navigable, it would create significant new questions about ownership of and trespass on private land, and it would be difficult to cabin expansion of the state's new constitutionally based jurisdiction over private land.

---

[6] <u>See, e.g.</u>, <u>Diana Shooting Club v. Husting</u>, 156 Wis. 261, 272, 145 N.W. 816 (1914) (holding that no trespass occurred because the hunter was located between the ordinary high water marks, property which was land held in trust for the public pursuant to the public trust doctrine).

14

Majority op., ¶84. The quotation from the majority demonstrates its misunderstanding of the argument of the DNR. The DNR in this case was not asserting that the public trust doctrine gives the state <u>ownership</u> of the private wetlands; rather it argues that the public trust doctrine allows the DNR to consider the impact on the wetlands when determining water levels. It quotes the <u>Just</u> court's statement that "[l]ands adjacent to or near navigable waters . . . are subject to the state public trust powers" and emphasizes the <u>Just</u> decision's reference to the wetlands "adjacent to" not "within" navigable waters.

¶174 Allowing the trustee to discharge its public trust duties by considering things that affect navigable waters is consistent with our precedent. If it could not, how then would the state discharge its extensive duties "not only to promote navigation but also to protect and preserve its waters for fishing, hunting, recreation, and scenic beauty"? <u>Envtl. Decade 1978</u>, 85 Wis. 2d at 526 (citations omitted). Therefore, the DNR did not err in relying on its public trust power to consider the impact of raising the water levels on adjacent private wetlands even when the wetlands are above the ordinary high water mark. The conclusion the majority reaches is a novel interpretation that cannot be squared with the extensive public trust doctrine case law.

### III. THE "PROTECT . . . PROPERTY" ELEMENT OF WIS. STAT. § 31.02(1) DOES NOT REQUIRE ADMISSION OF THE STRICKEN EVIDENCE.

15

¶175 Despite acknowledging that the decision adopted by the DNR was "meticulous [and] comprehensive," the majority reverses, holding that the DNR was required to consider additional evidence on the secondary or indirect economic impacts of raising the water level when making its determination under Wis. Stat. § 31.02(1).[7] Because I do not believe the statute requires the DNR to consider the evidence that was stricken to discharge its duty to "protect . . . property," I dissent.

¶176 During the ten-day contested case hearing, a significant amount of evidence was heard. The parties presented testimony and other evidence related to the economic impact of the change in the water level, including testimony on the implications for navigation, information about the impact on use and enjoyment of riparian property by riparian owners, impact on fish and fowl, and information about the impact on natural beauty and recreation. Some evidence was later stricken from the record on the grounds that the "[s]econdary or indirect economic impacts of a water level determination do not bear on the statutory standard set forth in section 31.02(1)." The stricken evidence included testimony and exhibits from experts who testified as to the potential economic effects of the water level determination on residential property values, business incomes, and tax revenues. However, the DNR's decision

---

[7] The majority holds: "We find that history, purpose, precedent, and the DNR's past practice support a broad interpretation of the phrase 'protect . . . property' so that the DNR is not limited to consideration of hydrologic damage to real property and riparian rights when making a water level determination under Wis. Stat. § 31.02(1)." Majority op., ¶132.

16

specifically noted its consideration of riparian property owner's interests in their property:

> The diminished ease of access experienced by many riparians and their desire for higher water levels, reflects their diminished utility and enjoyment of their property, which doubtless reduces the value of that property to them. This diminished utility and enjoyment of the property, and the expectation that higher water would enhance the utility and enjoyment of riparian property, has been considered and weighed under the standards of Wis. Stat. § 31.02(1).

(Emphasis added).

¶177 As explained above, Wis. Stat. § 31.02(1) states: "The department, in the interest of public rights in navigable waters or to promote safety and protect life, health and property[,] may regulate and control the level and flow of water in all navigable waters . . . ." Wis. Stat. § 31.02(1) (emphasis added). The majority focuses on "protect . . . property" and interprets it to mean that striking the secondary or indirect economic impact evidence constituted reversible error. The more reasonable interpretation of the statute, as demonstrated by the quotation set forth above, is that the DNR sufficiently considered the protection of property when making its determination under Wis. Stat. § 31.02(1).

¶178 In other statutes that the DNR administers, the legislature has specifically included language about such economic impact, whereas in § 31.02(1) the legislature has not signaled that the DNR must consider such secondary or indirect economic impact. For example, Wis. Stat. § 30.195(2)(c)2 requires consideration of whether the proposed change "will improve the economic or aesthetic value of the applicant's

17

land." Wisconsin Stat. § 285.01(12) requires the DNR to consider "energy, economic and environmental impacts and other costs" to determine air-pollution regulation. The DNR's permitting process for dams under Wis. Stat. § 31.06(3)(b) looks at whether the proposal is "in the public interest, considering ecological, aesthetic, economic and recreational values." None of this language is present in Wis. Stat. § 31.02(1). If the legislature intended that the DNR must consider such secondary or indirect economic impact, the legislature would have drafted the statute to signal such a requirement.[8]

¶179 As the court of appeals aptly observed, the District's interpretation, now adopted by the majority, has no logical stopping point. Rock-Koshkonong Lake Dist. v. DNR, 2011 WI App 115, ¶43, 336 Wis. 2d 677, 803 N.W.2d 853. If it is reversible error not to consider this type of secondary or indirect economic impact, what evidence is the fact-finder, in its discretion, allowed to exclude? The court of appeals explained this problem:

> For example, it is unclear under the District's construction whether the DNR's consideration of economic effects on real property would be limited to property values of riparian owners or would also include the values of adjacent or area properties not situated directly on the lake. Similarly, if the DNR were required to consider revenues of businesses directly linked to lake recreational activities, like

---

[8] Further support for this proposition is found in the majority's explanation of zoning ordinances which explicitly require a consideration of the "tax base" when making zoning decisions. Majority op., ¶141. Wisconsin Stat. § 31.02(1) contains no such language evincing the legislature's intent that the DNR consider secondary or indirect economic evidence.

18

marinas and bait shops, would it also be required to consider revenues of businesses with less direct links to use of navigable waters, such as gas stations and convenience stores?

Id., ¶43. The majority's interpretation of this statute adds an unnecessary layer of confusion for the DNR when reviewing these cases.

¶180 Instead of applying the governing statute or this court's interpretation of similar statutes, the majority relies on language from Railroad Commission cases from the early 1900s to support its conclusion that the legislature in 1915 did not intend to exclude riparian rights from consideration in Wis. Stat. § 31.02(1), and that therefore, it was reversible error to exclude evidence of such secondary or indirect economic impact to water level changes.[9] The language in these Railroad Commission decisions, on closer examination, supports the DNR's position that the duty to protect property requires consideration of only physical impacts on property. The

_____

[9] The majority also relies on a legislative report from 1910, Report of the Comm. on Water Powers, Forestry, and Drainage of the Wis. Leg. 1910, 49th Leg., which explained that land near the shores of lakes was becoming very valuable. See majority op., ¶135. The majority then states: "In light of the legislative reports giving rise to the Water Powers Act containing the 'protect . . . property' language of Wis. Stat. § 31.02(1), one can reasonably infer that riparian residential property and lake-based businesses were prime considerations for protecting property." Id., ¶136. The majority fails to connect the observations in the legislative report with its "reasonable inference." One could just as reasonably infer that protection from physical damage to lakeshore property was the prime consideration for including language about protecting property in the statute and that the legislature did not expect the Railroad Commission to consider such secondary or indirect economic impact from changing water levels.

19

majority finds its support, in one case, by focusing on what the Railroad Commission did <u>not</u> say—which is dubious support at best. It finds its support in the second case by focusing on a passing reference to private development, while not acknowledging the actual basis given by the Railroad Commission for its holding—which clearly focuses on the potential for shoreline and property "to be destroyed."

¶181 The first of the Railroad Commission cases on which the majority relies, <u>Town of Bear Lake v. Wisconsin-Minnesota Light & Power Co.</u>, 16 W.R.C.R. 710 (1915), involved a dispute over the water level maintained by a dam and that level's physical impact on surrounding land. The Railroad Commission stated: "[t]his level will not endanger life or health . . . [i]t will, however, affect property and overflow a large acreage of land . . . ." <u>Id.</u> at 716. The majority explains that the Railroad Commission's decision "did not explicitly limit the protection of property to only direct physical impacts." Majority op., ¶137. The <u>absence</u> of an explicit limitation is not evidence that the statute requires consideration of such secondary or indirect economic impact; it is the natural result of the fact that <u>Bear Lake</u> was about physical flooding of property.

¶182 The other Railroad Commission case, <u>In re Determining the High Water Mark to be Established on the Rest Lake Reservoir Operated by the Chippewa and Flambeau Improvement Co.</u>, 16 W.R.C.R. 727, 731 (1915), considered Rest Lake's water level, and like the <u>Bear Lake</u> decision, involved severe physical damage

20

to property. The Chippewa & Flambeau Improvement Company requested permission from the Railroad Commission to adopt certain high and low water marks, but property owners vigorously protested——arguing that the wide variation in water levels negatively affected their property. Id. at 731. The Railroad Commission agreed with property owners that the "disastrous effects upon shore property are only too plainly visible" from such a great variation in the water level. Id. at 734. It described the consequences as follows:

> Banks are lined with dead trees, logs, rocks and debris in an effort to prevent the shore lines from being obliterated. . . . When the banks give away large trees fall into the water. In one instance, thirty large green timber trees were counted lying in the lake where the shore had been taken away this year. . . . In places the old shore lines have disappeared . . . . The gradual disappearance of what are now islands was fully shown by the testimony.

Id. While the Railroad Commission briefly mentioned that large sums of money were used to improve private homes along the lake, its ultimate reason for protecting this property was concern for potential physical damage rather than secondary or indirect economic impact. In denying the petition, the Railroad Commission found, "[t]he effect of [the proposed water level] will be to give a very wide variation in levels, tending to destroy the shore line and property around the lakes." Id. at 738 (emphasis added). Neither of these cases supports the majority's conclusion about the legislative intent in 1915.

¶183 Further, the majority minimizes this court's past interpretation of similar statutory language, which has explicitly limited its reading to a narrow interpretation of the

21

language. In <u>City of New Lisbon v. Harebo</u>, this Court held that a dam may "endanger property" when "by reason of its location, or manner of construction, or the character of the soil upon which it is built . . . it [would] tend to flood cities or villages or [would be] likely to give way and create havoc and destruction below the dam . . . ." <u>New Lisbon</u>, 224 Wis. 66, 73, 271 N.W. 659 (1937). We made sure to point out that "we are of the opinion that this is as much as the section can be held to mean." <u>Id.</u> Thus, this court expressly limited the construction of "endanger property," and concluded that a dam would not endanger property if injury to the property resulted from "normal flowage by the ordinary operation of the dam." <u>Id.</u> The court's narrow reading of "endanger property" as applying to only physical damage and hydrologic events supports a limited reading of "protect . . . property" in Wis. Stat. § 31.02.[10]

¶184 It is illogical and contrary to the plain meaning of the statute to hold, as the majority does, that language referring to "protect[ing] life, health and property" requires the DNR to consider such secondary or indirect economic impacts.

---

[10] Another case that provides support for the conclusion that such secondary or indirect economic impact is not required to be considered is <u>Wisconsin's Environmental Decade, Inc., v. DNR</u> (<u>Environmental Decade 1983</u>), 115 Wis. 2d 381, 340 N.W.2d 722 (1983). In <u>Environmental Decade 1983</u>, this court held that the DNR did not need to consider socioeconomic impact in determining whether it needed to issue an environmental impact study in connection with a permit. <u>Id.</u> at 395. While it is distinguishable on its facts (as noted by the majority), I agree with the DNR decision's assessment that this court's reasoning in <u>Environmental Decade 1983</u> "applies with similar force here, even though that case involved action by the DNR under Chapter 30, not Chapter 31, Stats."

22

It is apparent that the cases relied on by the majority do not lead to its conclusion. Further, contrary to the majority's position, the plain language is clear and certainly does not compel the majority's conclusion. The fact is that the DNR sufficiently considered the protection of property, and therefore, I conclude that it was not error to strike the secondary or indirect economic evidence that it struck.

## IV. CONCLUSION

¶185 This case presents a question that the majority can——indeed does——answer by interpreting Wis. Stat. § 31.02(1). Yet the majority unnecessarily reaches out to the constitutional principle of the public trust doctrine from the Wisconsin Constitution, constricting the doctrine and misreading this court's precedent, especially the well-settled law articulated in Just v. Marinette County. Wisconsin's long and robust history of protecting the public trust is widely acknowledged and respected. The public trust doctrine imposes on the state, as trustee, the affirmative duty to protect, preserve, and promote the public's right to Wisconsin's waters.

¶186 The majority opinion attempts to undermine this court's precedent, recharacterize its holdings, and rewrite history. Instead of limiting itself to addressing only what must be addressed, the majority seizes this opportunity to limit the public trust doctrine in an unforeseen way, transforming the state's affirmative duty to protect the public trust into a legislative choice. It needlessly unsettles our precedent and

23

weakens the public trust doctrine that is enshrined in the Wisconsin Constitution. This represents a significant and disturbing shift in Wisconsin law.

¶187 The majority also errs in expanding the type of evidence that the DNR must consider in these cases. A straightforward interpretation of Wis. Stat. § 31.02(1) would not require the DNR to consider secondary or indirect economic impact when making water level determinations. The economic evidence admitted during the ten-day contested case hearing was sufficient to discharge the DNR's duty to "protect . . . property," and the excluded evidence was not relevant or required. The DNR has a difficult job to do under this statute, and in this case, the DNR did it well. The decisions of the DNR, the circuit court, and the court of appeals each properly concluded that § 31.02(1) does not require consideration of such secondary or indirect economic impact. The fact is that the DNR sufficiently considered the protection of property, and therefore, it was not error to strike the secondary or indirect economic evidence that it struck.

¶188 For the foregoing reasons I respectfully dissent.

¶189 I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this dissent.